## OKLAHOMA TAX COMMISSION *v.* UNITED STATES.

Nos. 623, 624, and 625. Argued April 9, 1943.—Decided June 14, 1943.

*Messrs. A. L. Herr* and *Clifford W. King,* with whom *Mr. E. L. Mitchell* was on the brief, for petitioner.

*Mr. Warner W. Gardner,* with whom *Solicitor General Fahy* and *Messrs. Felix S. Cohen* and *Norman A. Gray* were on the brief, for the United States.

MR. JUSTICE BLACK delivered the opinion of the Court.

The United States brought these three actions to recover inheritance taxes imposed by the State of Oklahoma upon the transfer of the estates of three deceased members of the Five Civilized Tribes and paid under protest by the Secretary of the Interior from funds under his control belonging to those estates. The district court entered judgment on the merits for the State in each case. The Circuit Court of Appeals reversed. 131 F. 2d 635. We granted certiorari because of the importance of the cases in the administration of Indian affairs and to the

State of Oklahoma. The basic questions to be decided are whether, as a matter of state law, the state taxing statutes reach these estates, and whether Congress has taken from the State of Oklahoma the power to levy taxes upon the transfer of all or a part of property and funds of these deceased Indians.

The properties of which the estates are composed fall into four main categories: land exempt from direct taxation; land not exempt from direct taxation; restricted cash and securities held for the Indians by the Secretary of the Interior; and miscellaneous personal properties and insurance. The total value of the three estates was assessed at approximately $1,245,000, of which about 90% represents the value of the cash and securities.[1]

Initially we are met with the contention that Oklahoma did not intend to tax the estates of the members of the Five Civilized Tribes. We cannot agree with this view. The two controlling statutes broadly provide for a tax upon all transfers made in contemplation of death or intended to take effect after death as well as transfers "by will or the intestate laws of this state." [2] The language of the statutes does not except either Indians or any other persons from their scope. Efforts of Oklahoma to apply this tax to the estate of a deceased Quapaw Indian were frustrated by this Court's opinion in *Childers* v. *Beaver*, 270 U. S. 555,

---

[1] The taxes assessed on this property totalled approximately $37,000. The properties of which the estates were composed was as follows:

No. 623: Approximately 70 acres of restricted allotted land; 40 acres of land purchased from restricted funds; restricted cash and securities. Assessed value: $250,000.

No. 624: 240 acres of restricted allotted land; personal property; restricted cash and securities. Assessed value: $677,000.

No. 625: 160 acres of allotted restricted land; 160 acres of inherited restricted land; a four-fifths interest in 40 acres; an automobile; miscellaneous property, and insurance; restricted cash and securities. Assessed value: $318,000.

[2] Ch. 162, Sess. Laws, 1915; Ch. 66, Art. 5, Sess. Laws, 1935.

decided in 1926. Shortly afterwards the Oklahoma Supreme Court refused to sustain the tax on an Osage estate under the impression that this result was required by the *Beaver* decision; but, significantly, the Oklahoma court held that the scope of the state law should not be limited "further than the rule therein established." *Childers* v. *Pope,* 119 Okla. 300, 303, 249 P. 726, 729. About 1938, the Oklahoma taxing authorities apparently initiated new efforts to collect an estate tax from Indians. This state action followed our decision in *Superintendent* v. *Commissioner,* 295 U. S. 418, in which we held that the restricted income of Indians was subject to the federal income tax, and our decision in *Helvering* v. *Mountain Producers Corp.,* 303 U. S. 376, which overruled previous decisions limiting the power of the State to impose certain types of taxes on incomes derived from tax-exempt and restricted Indian property. The state tax authorities have with reasonable consistency interpreted their acts as covering estates such as these, and have attempted to enforce the statutes except when they considered enforcement precluded by decisions of this Court. The district court held that the state law does apply to these estates. This interpretation is consistent with that given by the state administrative authorities, with the language of the acts themselves and with the State Supreme Court's holding in *Childers* v. *Pope, supra.*

The respondent's second and major contention is that the State may not impose an estate tax upon the transfer of the restricted cash and securities because Congress by placing restrictions upon this property manifested a purpose to exempt it from Oklahoma estate taxes. Restricted property of an Indian is that which may not be freely alienated or used by the Indian without the approval of the Secretary of the Interior. We find, upon an examination of both the cases dealing generally with the taxation of Indian property and the statute which imposes the re-

striction, that the restriction, without more, is not the equivalent of a congressional grant of estate tax immunity for the cash and securities.[3]

The many cases dealing generally with the problem of Indian tax exemptions provide no basis for the Government's argument that Congress, in view of the existing legal framework, must have assumed that it would immunize the securities and cash from estate taxes by restricting their alienation. *Worcester* v. *Georgia,* 6 Pet. 515, held that a State might not regulate the conduct of persons in Indian territory on the theory that the Indian tribes were separate political entities with all the rights of independent status—a condition which has not existed for many years in the State of Oklahoma. The same principle was carried into the tax field in *The Kansas Indians,* 5 Wall. 737, and for the same reasons. That case also emphasized that the Indians could "not look to Kansas for protection," 759, and that Kansas was not "obliged to confer any rights on them," 758. The tax exemption, said the Court, must last until the Indians were "clothed with the rights and bound to all the duties of citizens," 756. A similar result was reached in *The New York Indians,* 5 Wall. 761, decided the same day, where the State sought to raise money by taxes to build roads in Indian reservations and where existing treaties forbade the State's building such roads. Later, for a

---

[3] It is unnecessary to consider the State's argument that Congress is without power to exempt these estates from taxation. This issue is not foreclosed by *Board of Commissioners* v. *Seber,* 318 U. S. 705, since there we decided no more than that Congress might authorize the exemption of certain Indian lands from taxation because of an historic policy in respect to those lands. Cf. *McCurdy* v. *United States,* 246 U. S. 263, 269.

*Choate* v. *Trapp,* 224 U. S. 665, holding that under certain circumstances the United States could not withdraw a tax exemption once assured, has no bearing on the instant problem since it is conceded that the question here is entirely one of what Congress has in fact directed.

period of time, Indian lands held in trust by the United States were found to be constitutionally tax-exempt on the theory that they were federal instrumentalities, i. e., that the lands were held by the United States for the Indians, and were therefore non-taxable. *United States* v. *Rickert,* 188 U. S. 432. In time, this constitutional concept was expanded to grant tax exemption to the income derived from Indian lands, whether tribally or individually owned, even when the privilege of exploitation had been granted to non-Indian lessees.[4] The instrumentality concept ultimately resulted in a decision exempting Indian estates from taxation. *Childers* v. *Beaver, supra.* None of these cases held, nor has this Court ever decided, that congressional restriction of an Indian's income carried an implication of estate tax exemption.

The underlying principles on which these decisions are based do not fit the situation of the Oklahoma Indians. Although there are remnants of the form of tribal sovereignty, these Indians have no effective tribal autonomy as in *Worcester* v. *Georgia, supra;* and, unlike the Indians involved in *The Kansas Indians* case, *supra,* they are actually citizens of the State with little to distinguish them from all other citizens except for their limited property restrictions and their tax exemptions.[5] Their lands are held in fee, not in trust, as in the *Rickert* case, and the doctrine of constitutional immunity from taxation for the income of their holdings on the federal instrumentality theory has been renounced, *Helvering* v. *Mountain Pro-*

---

[4] *Choctaw, O. & G. R. Co.* v. *Harrison,* 235 U. S. 292; *Indian Territory Oil Co.* v. *Oklahoma,* 240 U. S. 522; *Jaybird Mining Co.* v. *Weir,* 271 U. S. 609; *Howard* v. *Gypsy Oil Co.,* 247 U. S. 503; *Large Oil Co.* v. *Howard,* 248 U. S. 549; *Gillespie* v. *Oklahoma,* 257 U. S. 501.

[5] Under the Acts of June 18, 1934, 48 Stat. 984, and June 26, 1936, 49 Stat. 1967, 25 U. S. C. § 501 *et seq.,* some progress has been made in the restoration of tribal government. Cohen, Handbook of Federal Indian Law, 455, 129–133, 142–143.

*ducers Corp.*, 303 U. S. 376. *Childers* v. *Beaver, supra,* was in effect overruled by the *Mountain Producers* decision. The immunity formerly said to rest on constitutional implication cannot now be resurrected in the form of statutory implication.

The cash and securities of which these estates are almost entirely composed were restricted by the Act of January 27, 1933.[6] Unless the tax immunity is granted by the restriction clause itself, there is not a word in the Act which even remotely suggests that Congress meant to exempt Indians' cash and securities from Oklahoma's estate taxes. We conclude that this Act does not exempt the restricted property from taxation for two reasons: (1) the legislative history of the Act refutes the contention that an exemption was intended; and (2) application of the normal rule against tax exemption by statutory implication prevents our reading such an implication into the Act.

The 1933 Act was intended to serve two purposes relevant to this case. One was to continue the restrictions on Indian property for the purpose of protecting the Indians from loss to individuals who might take advantage of them; and the other was to preserve the status of certain

---

[6] 47 Stat. 777.

". . . That all funds and other securities now held by or which may hereafter come under the supervision of the Secretary of the Interior, belonging to and only so long as belonging to Indians of the Five Civilized Tribes in Oklahoma of one-half or more Indian blood, enrolled or unenrolled, are hereby declared to be restricted . . . *Provided,* That where the entire interest in any tract of restricted and tax-exempt land belonging to members of the Five Civilized Tribes is acquired by inheritance, devise, gift, or purchase, with restricted funds, by or for restricted Indians, such lands shall remain restricted and tax-exempt during the life of and as long as held by such restricted Indians, but not longer than April 26, 1956, . . . *And provided further,* That all minerals including oil and gas, produced from said land so acquired shall be subject to all State and Federal taxes as provided in section 3 of the Act approved May 10, 1928 (45 Stat. L. 495)."

Indian land as non-taxable until 1956. See the concurring opinion of MR. JUSTICE RUTLEDGE in *Board of Commissioners* v. *Seber,* 318 U. S. 705, 719. This Act was before two Congresses, the 71st and the 72d. It was the subject of exhaustive debate, as well as of several committee reports, and there is no indication whatever in all that discussion of an intention to exempt Indians from estate taxes.[7]

The bill was sponsored by Oklahoma Congressmen who said nothing which supports the imputation that they intended to deprive their State of this income. It was described by its sponsor, Congressman Hastings, as follows:

"You ask me what the bill does. If the Members of Congress understood the bill there would not be a vote against it. Oil has been struck underneath some of the lands allotted to the members of these tribes. Some of these full-blood allottees without business experience, now have to their credit $100,000, $200,000 and, it is estimated, up to $1,000,000. Suppose one of these Indian allottees died after April 26, 1931. Then this money must be turned over to these heirs without supervision. Do you want to do that? Is there a man on the floor of the House who would want to do that?" [8]

---

[7] Elements of the 1933 statute were included in H. R. 15603, 71st Congress. The bill was recommitted to the Committee on Indian Affairs for further consideration, 74 Cong. Rec. 3956–3958. This discussion includes a report of the Department of the Interior recommending legislation substantially similar to that finally enacted in 1933. The House later amended the provisions of its own bill into S. 6169. 74 Cong. Rec. 7219–7222. The bill as amended was not approved by the Senate. The plan was re-introduced in the 72d Congress as H. R. 8750 and was discussed by the House at 75 Cong. Rec. 8163–8170, and by the Senate at 76 Cong. Rec. 2200. This bill was passed by the 72d Congress and became the statute under consideration.

[8] 75 Cong. Rec. 8163.

This purpose, and none other, is reiterated throughout the discussion—not a word of an intention to expand tax exemptions was spoken by any Congressman.

The legislative history not only fails to give any affirmative support to such an implication but expressly negatives that intent. The principal clause of the bill dealing with taxation is that which continues a limited land tax-exemption for twenty-five years. On two separate occasions, in two Congresses, the bill's sponsor assured the House of Representatives: "This [bill] only applies to restricted and tax-exempt land. This does not increase tax-exempt land at all." [9] Such a bill, carefully drawn so as not to widen tax exemptions for land, and without a word of such intent in its legislative history, cannot be supposed by implication to have prohibited estate taxes. If there could be any doubt of this proposition it is surely removed by a later clause of the 1933 statute which provides that all minerals extracted from the land should be subject to state taxation. [10] Congress could not have intended that the minerals themselves should be subject to taxation, but that the proceeds of their sale, even further removed from the land itself, should be immune.

This Court has repeatedly said that tax exemptions are not granted by implication. *United States Trust Co.* v. *Helvering,* 307 U. S. 57, 60. It has applied that rule to taxing acts affecting Indians as to all others. As was said of an excise tax on tobacco produced by the Cherokee Indians in 1870, "If the exemption had been intended, it would doubtless have been expressed." *Cherokee Tobacco,* 11 Wall. 616, 620. In holding the income tax applicable to Indians, the Court said, "The terms of the 1928 Revenue Act are very broad, and nothing there

---

[9] 74 Cong. Rec. 7222 and, similarly, 75 Cong. Rec. 8170.

[10] See the last clause of the statute as set forth in Note 6, *supra.*

indicates that Indians are to be excepted. . . . If exemption exists it must derive plainly from agreements with the Creeks or some Act of Congress dealing with their affairs." *Superintendent* v. *Commissioner, supra,* 420. If Congress intends to prevent the State of Oklahoma from levying a general non-discriminatory estate tax applying alike to all its citizens, it should say so in plain words. Such a conclusion cannot rest on dubious inferences. "Nontaxability and restriction upon alienation are distinct things," *Superintendent* v. *Commissioner, supra,* 421, and when Congress wants to require both nonalienability and nontaxability it can, as it has so often done, say so explicitly.[11]

It is true that our interpretation of the 1933 statute must be in accord with the generous and protective spirit which the United States properly feels toward its Indian wards, but we cannot assume that Congress will choose to aid the Indians by permanently granting them immunity from taxes which they are as able as other citizens to pay. It runs counter to any traditional concept of the guardian and ward relationship to suppose that a ward should be exempted from taxation by the nature of his status, and the fact that the federal government is the guardian of its Indian ward is no reason, by itself, why a state should be precluded from taxing the estate of the Indian. We have held that the Indians, like all other citizens, must pay federal income taxes. *Superintendent* v. *Commissioner, supra,* 421. "Wardship with limited power over his prop-

---

[11] See, for examples, Act of July 1, 1898, 30 Stat. 567, tract made "inalienable and nontaxable"; Act of March 1, 1901, 31 Stat. 861, tract made "nontaxable and inalienable"; Act of June 30, 1902, 32 Stat. 500, tract to remain "nontaxable, inalienable, and free from any incumbrance"; Act of April 26, 1906, 34 Stat. 137, "all lands upon which restrictions are removed shall be subject to taxation, and the other lands shall be exempt from taxation." Cf. for special treatment of the Quapaw Indians the Act of April 17, 1937, 50 Stat. 68.

608

erty" did not there "without more render [the Indian] immune from the common burden." A federal court has held, in a well-reasoned decision defended before us by the Solicitor General of the United States, who is not a party to this action, that an Indian's estate is subject to the federal estate tax. *Landman* v. *Commissioner,* 123 F. 2d 787.[12] Congress cannot have intended to impose federal income and inheritance taxes on the Indians and at the same time exempt them by implication from similar state taxes.

Congress has passed laws under which Indians have become full-fledged citizens of the State of Oklahoma.[13] Ok-

[12] Cert. den., 315 U. S. 810. The Department of the Interior in the *Landman* case made substantially the same argument it makes here against taxation of Indians' estates. It emphasizes that the decision of the Circuit Court of Appeals would lead to similar taxation by states. The Solicitor General, opposing the Department of Interior in the *Landman* case, insisted that under *Superintendent* v. *Commissioner,* 295 U. S. 418, and *Choteau* v. *Burnet,* 283 U. S. 691, the Indians' estates should be subjected to taxation; and that even if the Indians' lands were exempt from direct taxation, the estate tax should be upheld as an excise tax, indirect in its nature, citing *United States Trust Co.* v. *Helvering,* 307 U. S. 57; *Plummer* v. *Coler,* 178 U. S. 115; *Greiner* v. *Lewellyn,* 258 U. S. 384. In other words, the Solicitor General in seeking to uphold the validity of a federal estate tax as applied to Indian estates opposed the argument which the Department of the Interior made then and which it makes now, the only difference being that in the instant case the Department of the Interior is seeking to invalidate a state instead of a federal tax.

[13] It must not be assumed that the Oklahoma Indians are all unable to pay estate taxes. The estates of the three Indians here involved, as has been noted, total well over $1,200,000. Oil and gas receipts of the Five Civilized Tribes from 1904 to 1937 were in excess of one hundred million dollars. Hearing on S. Res. 168, Senate Committee on Indian Affairs, 75th Cong., 3d Sess., p. 36. The Osages in the same period received $261,000,000. p. 34. Annual per capita income for the Osage Tribe as shown by a careful study made in 1928 was $19,119. The Problem of Indian Administration, Institute for Government Research, Lewis Meriam, Director, chapter 10, General Economic Condi-

lahoma supplies for them and their children schools, roads, courts, police protection and all the other benefits of an ordered society. Citizens of Oklahoma must pay for these benefits. If some pay less, others must pay more. Since Oklahoma has become a State, it has been authoritatively stated that tax losses resulting from tax immunity of Indians have totalled more than $125,000,000, a sum only slightly less than the bonded indebtedness of the State.[14] If Congress intended to relieve these Indians from the burden of a state inheritance tax as a consequence of our national policy toward Indians, there is still no reason why we should imply that it intended the burden to be borne so heavily by one state. But there is a complete absence of any evidence of congressional belief that these exemptions are required on equitable grounds, no matter on which sovereign the burden falls. Here is a tax based solely on ability to pay.[15] "Only the same duties are exacted as from our own citizens. The burden must rest

tions, 430, 450. 2,826 Osage Indians are reported to own tribal and individual property valued at $31,968,000. p. 443. The economic status of the Osages is discussed in *McCurdy* v. *United States*, 246 U. S. 263, 265.

For a discussion of the respected position of Indians in Oklahoma, see the dissenting opinion of Judge Williams, *Board of Commissioners* v. *Seber*, 130 F. 2d 663, 681–683. The 1933 Act discussed above was sponsored in the House of Representatives by Congressman Hastings of Oklahoma, who was himself of Indian descent.

[14] Hearings before the Senate Committee on Indian Affairs, note 13, *supra*, p. 4.

[15] "The view of the survey staff is that the Indians must be educated to pay taxes just as they must be educated to do other things. The taxes imposed upon them must always be properly related to their capacity to pay. For them an income tax would be infinitely better than a general property tax because of its direct relationship to their capacity to pay. The returns from such a tax would obviously be extremely small at the outset, but they would increase with the increasing productivity of the Indians." The Problem of Indian Administration, note 13, *supra*, 478; and see also 43, 98.

somewhere.    Revenue is indispensable to meet the public necessities.    Is it unreasonable that this small portion of it shall rest upon these Indians?"    *Cherokee Tobacco, supra,* p. 621.

Recognizing that equality of privilege and equality of obligation should be inseparable associates, we have recently swept away many of the means of tax favoritism. *Graves* v. *New York ex rel. O'Keefe,* 306 U. S. 466, permitted states to impose income taxes upon government employees, and *Helvering* v. *Gerhardt,* 304 U. S. 405, permitted the federal government to impose taxes on state employees.    *O'Malley* v. *Woodrough,* 307 U. S. 277, overruled a previous decision which held that judges should not pay taxes just as other citizens, and *Helvering* v. *Mountain Producers Corp., supra,* repudiated former decisions seriously limiting state and federal power to tax. See also *Metcalf & Eddy* v. *Mitchell,* 269 U. S. 514, and *James* v. *Dravo Contracting Co.,* 302 U. S. 134.    The trend of these cases should not now be reversed.

What has been said requires the conclusion that the cash and securities are not exempted by any existing legislation from state estate taxation, and this is likewise true of the personal property in two of these estates.

The validity of the taxes on the transfer of the land presents a somewhat different problem.    Some of these lands are exempt from direct taxation by virtue of explicit congressional command.    The Act of May 10, 1928, 45 Stat. 495, for example, provides that Indians of a class which includes the three deceased should select up to 160 acres of his allotted, inherited or devised restricted lands, which "shall remain exempt from taxation while the title remains in the Indian designated . . . or in any full-blood Indian heir or devisee," while all other restricted lands are made subject to taxation by Oklahoma.    The State argues that congressional exemption of the land

from direct state taxation does not exempt the land from an estate tax, because of the principles announced in *United States Trust Co.* v. *Helvering, supra.* A majority of the Court concludes that this principle does not apply to Indian lands specifically exempted from direct taxation. We therefore hold that the transfer of those lands which Congress has exempted from direct taxation by the State are also exempted from estate taxes.

To summarize:

In No. 623, the transfer of the cash and securities is taxable, the transfer of the homestead and other allotted land, exempted under the Act of May 10, 1928, is not. The 43 acres purchased for the intestate from her restricted funds was taxable at the time of her death, *Shaw* v. *Gibson-Zahniser Oil Corp.*, 276 U. S. 575, and hence is subject to the estate tax.

In No. 624, the transfer of the cash and securities and the personal property is taxable. The deceased died before the Act of May 10, 1928, took effect, but her 240-acre holding was specifically exempt from direct taxation at the time of her death under § 19 of the Act of April 26, 1906, and the transfer of lands is therefore not taxable.

In No. 625, the same result as in No. 623 follows for the restricted lands which were appropriately selected for exemption under the Act of May 10, 1928, and for the personal property, cash, and securities. The judgment and the insurance policy are to be treated as in a class with the personal property, cash, and securities. It is conceded that the 160 acres of inherited property held by the deceased was taxable at the time of his death because in excess of the exemption permitted by the 1928 Act, and this land is, therefore, subject to the estate tax. While the status of the deceased's four-fifths interest in a 40-acre tract is not clear from the record, no showing has been made that it is not taxable.

The Government is entitled to recovery of the estate tax paid on the transfer of lands exempt from direct taxation, and to no more. The judgment below is vacated and the cause is remanded to the district court for further proceedings consistent with this opinion.

*It is so ordered.*

MR. JUSTICE DOUGLAS:

I concur in the result and in the disposition of the case. While I agree that transfers of the restricted Indian lands are not subject to Oklahoma's estate tax, I take the contrary view as respects the funds and securities covered by the Act of January 27, 1933, 47 Stat. 777. In my opinion transfers of those funds and securities are subject to the tax for the two reasons set forth in the opinion of the Court.

MR. JUSTICE MURPHY, dissenting in part:

I dissent because the opinion of the Court rejects a century and a half of history. We are not here dealing with mere property or income that is tax-exempt. This is not the ordinary case of government and its citizens, or a group of citizens who seek to avoid their obligations. Our concern here is entirely different. It is with a people who are our wards and towards whom Congress has fashioned a policy of protection due to obligations well known to all of us. It rests with Congress to choose when we are done with that trusteeship. Meanwhile it is our obligation to interpret in the light of the history of that relationship all legislation which Congress has enacted to carry out its Indian policy.

Normally it is true that strong considerations of fiscal and social policy view tax exemptions with a hostile eye. Such exemptions are not to be lightly implied, and every reasonable implication in construing legislation is to be

made against their grant. But this general doctrine against tax exemption is irrelevant in considering the taxing power of a state in relation to Indians. For as to them a totally different principle comes into operation, namely, the special status of Indians during the whole course of our constitutional and legal history. There can be no doubt of Congress' plenary power to exempt Indians and their property from all forms of state taxation. Such power exists to prevent impairment of the manner in, or means by which Congress effectuates its Indian policy, at least so long as Congress has not determined that the interests of the Indians require their complete release from tutelage or the final termination of the United States' guardianship over them. *Board of Commissioners* v. *Seber,* 318 U. S. 705; cf. *Tiger* v. *Western Investment Co.,* 221 U. S. 286, 315–16; *Brader* v. *James,* 246 U. S. 88, 96; *United States* v. *McGowan,* 302 U. S. 535, 538. See *United States* v. *Sandoval,* 231 U. S. 28, 45–47. To deny such constitutional power is to deny the presupposition of all legislation relating to Indians as well as an unbroken line of decisions on Indian law in this Court and all that underlies them. This course of legislation and adjudication may be fairly summarized as recognizing the special relation of Indians toward the United States and the exclusion of state power with relation to them, except in so far as the federal government has actually released to the state governments its constitutional supremacy over this special field. Therefore, so far as the power of a state to tax Indian property is concerned, the ordinary rule of tax exemption is reversed; a state must make an affirmative showing of a grant by Congress of the withdrawal of the immunity of Indian property from state taxation. This is so because it is Indian property and because Indians stand in a special relation to the federal government from which the states are excluded unless the Congress has manifested

a clear purpose to terminate such an immunity and allow states to treat Indians as part of the general community.

Congress has manifested no such purpose with regard to the estates of the deceased Indians before us. On the contrary, those Indians were subject to federal control.[1] Most of their allotted lands were expressly exempt from taxation, and, as the opinion of the Court recognizes, this removed them from the operation of Oklahoma's estate tax.[2] But apart from these express exemptions, the bulk of the properties in the three estates were restricted against alienation and encumbrance by various acts of Congress.[3] History, as well as statements of Congress itself,[4] leave no doubt that property so restricted is beyond the taxing power of the states, unless and until Congress gives its consent. In other words restriction is tantamount to im-

---

[1] The deceased Indians in these three cases were enrolled full-blood Indians of the Five Civilized Tribes. Two were Seminoles and one was a Creek. Congress has not terminated the guardianship relation with respect to these tribes. They still exist (§ 28 of Act of April 26, 1906, 34 Stat. 137), and have recently been authorized to resume some of their former powers (Act of June 26, 1936, 49 Stat. 1967). Congress has regarded their members of the half Indian blood or more, whether enrolled or not, as restricted tribal Indians subject to federal control. The fact that these Indians are citizens is not inconsistent with their restricted status or the exercise of federal supervision over them. See *Board of Commissioners* v. *Seber, supra; Glenn* v. *Lewis,* 105 F. 2d 398.

[2] See Act of July 1, 1898, 30 Stat. 567; Act of March 1, 1901, 31 Stat. 861; Act of June 30, 1902, 32 Stat. 500; § 19 of Act of April 26, 1906, 34 Stat. 137; § 4 of Act of May 10, 1928, 45 Stat. 495 and 733.

The fact that the exemptions do not mention inheritance or estate taxes is unimportant. As pointed out before, contrary to the general rule Indian tax exemptions are to be liberally construed. See *Carpenter* v. *Shaw,* 280 U. S. 363, 366–67. For that reason decisions, such as *U. S. Trust Co.* v. *Helvering,* 307 U. S. 57, that statutory exemptions from taxation do not include an exemption from estate taxes, have no application here.

[3] In addition to the statutes cited in Note 2, *supra,* see also Act of May 27, 1908, 35 Stat. 312; and Act of January 27, 1933, 47 Stat. 777.

[4] See Note 12, *infra.*

munity from state taxation. That was the basis of decision in *Choctaw, O. & G. R. Co.* v. *Harrison,* 235 U. S. 292; *Indian Territory Oil Co.* v. *Oklahoma,* 240 U. S. 522; *Jaybird Mining Co.* v. *Weir,* 271 U. S. 609; *Howard* v. *Gipsy Oil Co.,* 247 U. S. 503; *Large Oil Co.* v. *Howard,* 248 U. S. 549; *Gillespie* v. *Oklahoma,* 257 U. S. 501. In all those cases a non-Indian lessee of restricted Indian lands was held immune from state taxation of various kinds because, and only because, the lands themselves and the leasing of them were held to be immune from taxation, and this in turn because they were the lands of Indians held in Government tutelage, who were permitted to lease the lands only with the approval of the Secretary of the Interior. This immunity for lessees was withdrawn by *Helvering* v. *Mountain Producers Corp.,* 303 U. S. 376, which overruled *Gillespie* v. *Oklahoma, supra.* Cf. the dissenting opinions in *Burnet* v. *Coronado Oil & Gas Co.,* 285 U. S. 393. In neither the *Coronado* case nor in the *Mountain Producers* case was there any contention that the land in the hands of the lessors was subject to taxation. That was recognized and accepted as correct. The point was that even though the land was tax immune in the hands of the lessor, the lessor's immunity did not extend to the lessee who had no personal immunity and who acquired the land for his own purposes and made a profit from it. In other words, the withdrawal of immunity from a non-Indian lessee of restricted Indian land rests upon the remoteness of the effect of that taxation upon such Indian property, cf. *Graves* v. *New York ex rel. O'Keefe,* 306 U. S. 466, not upon a notion that Congress did not intend by imposing restrictions to prohibit state taxation of the interest of Indians in their restricted property, nor upon the supposition that Congress lacks power to do so. Congress plainly has power to implement its Indian policy by forbidding state taxation to burden the interest of an Indian in his property. Cf. *Shaw* v. *Gibson-Zahniser Oil Corp.,* 276

U. S. 575; *Board of Commissioners* v. *Seber,* 318 U. S. 705. It exercises that power simply by imposing the restrictions.

That Congress has considered the restriction of Indian property against alienation and encumbrance as carrying with it immunity from state taxation for the period of the restriction is clear not only from statements of Congress itself to that effect,[5] but also from the long history of such restrictions and the purpose sought to be achieved, the protection of a dependent people from their own improvidence and the exploitation of others.

Congress early established the complete and exclusive control of the federal government over the purchase and disposition of Indian lands, both tribal and individual.[6] The protection afforded by those and subsequent restrictive acts and treaties extended to trespasses, transfers, tax sales, tax liens, and other attempted interferences by the state governments with federal control over Indian lands. See *Worcester* v. *Georgia,* 6 Pet. 515; *The Kansas Indians,* 5 Wall. 737; *The New York Indians,* 5 Wall. 761.

The United States was unable, however, to prevent state interference with the Creeks and the Seminoles in their domains east of the Mississippi, and accordingly proposed removal west of the Mississippi, guaranteeing that there no State or Territory should "ever have a right to pass laws for the government of such Indians, but they shall be allowed to govern themselves, so far as may be compatible with the general jurisdiction which Congress may think proper to exercise over them." Article XIV, Treaty of March 24, 1832 (7 Stat. 366). Long after the removal this guarantee was reaffirmed. Article IV, Treaty of August 7, 1856 (11 Stat. 699). Nothing in the subsequent

---

[5] See Note 12, *infra.*

[6] Indian Trade and Intercourse Acts of July 22, 1790, 1 Stat. 137; March 1, 1793, 1 Stat. 329; March 3, 1799, § 12, 1 Stat. 743, 25 U. S. C. § 177.

treaties and allotment acts relating specifically to the Creeks and the Seminoles was inconsistent with this guarantee of freedom from state control.[7]   And Congress was careful to provide that nothing in the creation of the State of Oklahoma should qualify this promise.   Thus the Oklahoma Enabling Act (34 Stat. 267) provided that the Oklahoma Constitution should not "limit or affect the authority of the Government of the United States to make any law or regulation respecting such Indians, their lands, property, or other rights by treaties, agreement, law, or otherwise, which it would have been competent to make if this Act had never been passed."   The constitution adopted by the people of Oklahoma renounced any claims to Indian lands (Art. 1, § 3), and exempted from taxation "such property as may be exempt by reason of treaty stipulations, existing between the Indians and the United States Government, or by Federal laws, during the force and effect of such treaties or Federal laws" (Art. X, § 6). See *Tiger* v. *Western Investment Co.,* 221 U. S. 286, 309; *Ex parte Webb,* 225 U. S. 663, 682–83; *Ward* v. *Love County,* 253 U. S. 17; *Carpenter* v. *Shaw,* 280 U. S. 363, 366.

As we recently said in *Board of Commissioners* v. *Seber, supra,* Congress in 1887 turned from a policy of protecting Indian tribes in the possession of their domains to a program, now discontinued, of assimilating the Indians through dissolution of their tribal governments and the compulsory individualization of their lands.   This allotment program evolved out of the historical background sketched above, and took its cue from the previous protection and freedom from state control accorded Indians and their lands.   The Indian surrendered tribal land, pro-

---

[7] See Treaty of March 21, 1866, 14 Stat. 755; Treaty of June 14, 1866, 14 Stat. 785; Curtis Act of 1898, 30 Stat. 495; Act of July 1, 1898, 30 Stat. 567; Act of March 1, 1901, 31 Stat. 861; Act of June 30, 1902, 32 Stat. 500.

tected against state taxation as well as against all other forms of voluntary and involuntary encumbrance and alienation. Cf. *The Kansas Indians, supra; The New York Indians, supra.* Under the various allotment acts he received in return land which was intended to have the same measure of protection for a temporary period, generally subject to extension. Thus the General Allotment Act of 1887 (24 Stat. 388) provided for the issuance to allottees of trust patents which were to declare: "the United States does . . . hold the land thus allotted, for the period of twenty-five years, in trust . . . and that at the expiration of said period the United States will convey the same by patent to said Indian . . . in fee, discharged of said trust and free of all charge or incumbrance whatsoever." [8] Lands so held in trust are immune from state taxation. *United States* v. *Rickert,* 188 U. S. 432.

The lands here involved were not allotted under "trust patents"; they were grants in fee subject to restrictions against alienation and encumbrance.[9] But there are no differences of substance between the two forms of tenure which suggest that while the one is exempt from state taxation, the other is not, or that Congress intended to favor Indians holding under "trust patents" over those holding restricted fees. Cf. *The Kansas Indians, supra,* at p. 755. The power of Congress over "trust" and "restricted" lands is the same, *Board of Commissioners* v. *Seber, supra,* and in practice the terms have been used interchangeably. See *United States* v. *Bowling,* 256 U. S. 484; cf. *Minnesota* v. *United States,* 305 U. S. 382. Both devices had a common purpose, to protect a dependent

[8] The President was authorized to extend the trust period in his discretion.

[9] See Act of July 1, 1898, 30 Stat. 567; Act of June 2, 1900, 31 Stat. 250; Act of March 1, 1901, 31 Stat. 861; Act of June 30, 1902, 32 Stat. 500; § 19 of Act of April 26, 1906, 34 Stat. 137; § 1 of Act of May 27, 1908, 35 Stat. 312; Act of May 10, 1928, 45 Stat. 495.

people against loss of their property through their own improvidence or the greed of others during the period of transition in which they began to assume the responsibilities of citizenship. To achieve this purpose the protection afforded by Congress was not niggardly. See *Tiger* v. *Western Investment Co.*, 221 U. S. 286; *Heckman* v. *United States*, 224 U. S. 413; *Brader* v. *James*, 246 U. S. 88.

State taxation of "restricted" lands as well as taxation of "trust" lands, in the absence of Congressional authorization, is a possible cause of the loss which Congress has said shall not occur. The restrictions are not limited to voluntary sale—consistently with their purpose they extend to all forms of transfer or encumbrance, involuntary as well as voluntary. Cf. *Goudy* v. *Meath*, 203 U. S. 146. The interference of state taxation with Congress' program of protection is made clear by the fact that the instant Oklahoma inheritance tax acts impose liens upon the property until the taxes are paid.[10] The possible consequences of a tax lien upon Indian property are pointed out in *The New York Indians, supra,* where it was held that the mere existence of a lien in a state taxing act invalidates it, despite a provision to the effect that no foreclosure of a lien should affect the Indian's right of occupancy. And, even when permitting specified forms of state taxation of restricted Indian property, Congress has significantly provided in numerous statutes that no tax lien should attach.[11] I conclude that when Congress imposed restrictions upon Indian property, it meant, and was saying in effect, that the property was exempt from state taxation while the restrictions continue or until

---

[10] Okla. S. L. 1915, c. 162, § 8, as amended by c. 296, § 5, Okla. S. L. 1919; Okla. S. L. 1935, c. 66, art. 5, § 9.

[11] See Act of May 6, 1910, 36 Stat. 348; Act of March 3, 1921, 41 Stat. 1225, 1249; Act of May 27, 1924, 43 Stat. 176; Act of May 29, 1924, 43 Stat. 244; Act of April 17, 1937, 50 Stat. 68.

Congress waives the immunity. Indeed, Congress has clearly stated that this was its intention by declaring in the Act of April 17, 1937, 50 Stat. 68, which permitted a gross production tax to be imposed by Oklahoma on lead and zinc produced from restricted Quapaw lands: "In accordance with the uniform policy of the United States Government to hold the lands of the Quapaw Indians while restricted and the income therefrom free from State taxation of whatsoever nature, except as said immunity is expressly waived, and, in pursuance of said fixed policy, it is herein expressly provided that the waiver of tax immunity herein provided shall be in lieu of all other State taxes of whatsoever nature on said restricted lands or the income therefrom, . . ." [12]

When Congress has intended that restricted property should be taxed, it has explicitly said so.[13] In the absence of such assent restricted property remains beyond the reach of a state's taxing power. Non-alienability and tax exemption have been said to be distinct things so far as vested rights are concerned, see *Choate* v. *Trapp*, 224 U. S. 665, 673, but this of course does not mean that the concepts of restriction and immunity from state taxation are unrelated. Nor does the circumstance that some of the ap-

---

[12] There are various other expressions of Congressional understanding on this point. For example, H. Rep. No. 2415, 71st Cong., 3d Sess., p. 1, advocating passage of what is now the Act of February 14, 1931, 46 Stat. 1108, declares: "Under existing law the restricted allotted lands of Indians of the Five Civilized Tribes are tax exempt while restricted." See also S. Rep. No. 982, 70th Cong., 1st Sess., pp. 3, 4, 5; S. Rep. No. 330, 65th Cong., 2d Sess., p. 4.

The Act of May 27, 1908, 35 Stat. 312, by specifically providing in § 4 that lands from which "restrictions have been or shall be removed shall be subject to taxation," strongly indicates a Congressional understanding that restriction amounted to tax exemption.

[13] For example, among the statutes applicable to the Creeks and Seminoles, see §§ 3 and 4 of the Act of May 10, 1928, 45 Stat. 495 and 733. See generally the statutes collected in Note 11, *supra*.

plicable statutes expressly provide specific tax exemptions for restricted lands indicate that restriction is not tantamount to immunity from state taxation.[14] At the time the allotments to the members of the Five Civilized Tribes were made there was no State of Oklahoma. It had been held that Congress had power to lay taxes upon Indian property within Indian Territory, *Cherokee Tobacco*, 11 Wall. 616, and its creature, the Territorial government, was agitating for the taxation of Indian property.[15] Restrictions, designed to protect the Indians from themselves and the actions of third parties, including state governments, did not bar taxation by the federal government which was the guardian of their interests.[16] Accordingly, specific tax exemptions were written into the allotment acts.[17] Express provisions as to the taxable status of restricted property in the later legislation appear only where the immunity is being limited and expressly waived in part or the restrictions are being changed.[18]

All of the lands which the opinion of the Court holds immune from Oklahoma's estate tax because of express exemptions were therefore also exempt at the moment of death on the additional ground that they were then subject to restrictions imposed by Congress and the concomitant tax immunity had not been waived. The other restricted lands in the estates are lands to whose taxation Congress has specifically consented, or else were of the type

---

[14] Act of July 1, 1898, 30 Stat. 567; Act of March 1, 1901, 31 Stat. 861; Act of June 30, 1902, 32 Stat. 500; § 19 of Act of April 26, 1906, 34 Stat. 137; § 4 of the Act of May 10, 1928, 45 Stat. 495 and 733.

[15] See Sen. Doc. 169, 58th Cong., 2d Sess.

[16] It is for this historical reason that cases such as *Superintendent* v. *Commissioner*, 295 U. S. 418, and *Landman* v. *Commissioner*, 123 F. 2d 787, have no bearing upon a consideration of the effect of restrictions upon the power of a state to tax.

[17] See Act of July 1, 1898, 30 Stat. 567; Act of March 1, 1901, 31 Stat. 861; Act of June 30, 1902, 32 Stat. 500.

[18] Act of April 26, 1906, 34 Stat. 137; Act of May 10, 1928, 45 Stat. 495.

to be taxable at the time of death under the decision in *Shaw* v. *Gibson-Zahniser Oil Corp.,* 276 U. S. 575.

The origin of restrictions upon the fund of members of the Five Civilized Tribes is somewhat different from that upon the lands, but the effect of the restrictions upon the taxability of the cash and securities in the three estates with which we are dealing is the same. Proceeds from sales or leases of restricted lands have always been regarded as "trust" or "restricted" funds by the Secretary of the Interior, who by regulations has required them to be paid to him or his representatives and held for the benefit of the Indian owner.[19] The validity of those administrative restrictions and the power of the United States to enforce them have been recognized. *Parker* v. *Richard,* 250 U. S. 235; *Mott* v. *United States,* 283 U. S. 747. And it has been held that funds so restricted by departmental regulation are exempt from state and local taxation. See *United States* v. *Thurston County,* 143 F. 287; *United States* v. *Hughes,* 6 F. Supp. 972. But we do not have to consider whether this administrative restriction alone is sufficient to confer tax exemption upon the cash and securities in the three estates.[20]

---

[19] Since 1908 the regulations prescribed by the Secretary under § 2 of the Act of 1908, 35 Stat. 312 and related statutes governing oil, gas and other mining leases of restricted lands, have recognized that proceeds from such leases are restricted and have required that all such money be paid to a representative of the Secretary. See 25 C. F. R. §§ 183.18, 183.20; see also § 20 of the regulations approved April 20, 1908.

[20] In *Shaw* v. *Gibson-Zahniser Oil Corp.,* 276 U. S. 575, the interest of an oil lessee in land purchased for an Indian by the Secretary of the Interior with the Indian's restricted funds and conveyed to the Indian by a restricted form of deed pursuant to conditions imposed by the Secretary, was held subject to an Oklahoma oil production tax. The opinion emphasized the difference between "a mere conveyancer's restriction" and action by Congress.

The Act of January 27, 1933 (47 Stat. 777), imposes Congressional restrictions by providing:

"That all funds . . . now held by or which may hereafter come under the supervision of the Secretary of the Interior, belonging to and only so long as belonging to Indians of the Five Civilized Tribes in Oklahoma of one-half or more Indian blood, enrolled or unenrolled, are hereby . . . restricted and shall remain subject to the jurisdiction of said Secretary until April 26, 1956, . . . "

This Act does not stand alone. It is part of Congress' long continued program of protection and it carries with it the gloss of the history of the restrictions outlined above. Congress was not imposing restrictions for the first time, and there is nothing to suggest that Congress intended them to have less than their traditional historical meaning of tax exemption in this Act. It is immaterial that the legislative history of the Act is silent with regard to the tax status of Indian funds. We are dealing not with a word, nor with an act, but with a course of history. That course makes it clear that the restricted funds in these estates were beyond the taxing power of Oklahoma.[21]

It is not our function to speculate whether it is wise at this late day to relieve from the ordinary burden of taxation Indians who enjoy the privileges of citizenship and who in some instances are persons of substantial means. Nor is it our legitimate concern that grants of tax exemption to Indian inhabitants may create serious fiscal problems in some states or in their local govern-

---

[21] Two of the decedents died before the Act was passed. The House Committee report, however, makes it clear that the restriction on funds was intended to be declaratory and retroactive. H. Rep. No. 1015, 72d Cong., 1st Sess. In view of this there is no reason why the restricted funds in the estates of those decedents, held by the Secretary, should not be deemed covered by that Act, and hence tax exempt by virtue of the restrictions.

mental subdivisions. Those matters, as well as the character, extent and duration of tax exemptions for the Indians, are questions of policy for the consideration of Congress, not the courts. *Board of Commissioners* v. *Seber, supra.* Our inquiry is not with what Congress might or should have done, but with what it has done. That inquiry can be answered here only by holding that the restricted funds in these estates, as well as the lands which the Court holds immune, were not subject to Oklahoma's estate tax.

The CHIEF JUSTICE, MR. JUSTICE REED and MR. JUSTICE FRANKFURTER join in this dissent.