GLENNY A. AND CAROL L. LAZORE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Lazore v. Commissioner
Docket No. 5750-89
United States Tax Court
T.C. Memo 1992-404; 1992 Tax Ct. Memo LEXIS 428; 64 T.C.M. (CCH) 182; July 16, 1992, Filed *428 Decision will be entered for respondent. Ps late filed their 1986 Federal income tax return on which they reported wage and interest income, but claimed that as members of the Mohawk Nation and the Six-Nation Iroquois Confederacy they were exempt from Federal income tax. Held, The language in the 1794 Treaty of the Six Nations (the Canadaiga Treaty), the 1794 Jay Treaty, and the 1815 Treaty of Ghent, as relied upon by Ps, considered in light of substantial historical and other evidence offered by Ps, cannot be reasonably construed to confer upon Ps an exemption from Federal income tax. Held, further, Ps are liable for the late filing additions to tax under sec. 6651(a)(1) and for the addition to tax for negligence under sec. 6653(a)(1)(A) and (B). For Petitioners: Peter Goldberger and James H. Feldman, Jr. For Respondent: Joseph Wilkes. BUCKLEY
BUCKLEY
MEMORANDUM FINDINGS OF FACT AND OPINION BUCKLEY, Special Trial Judge: This case was heard pursuant to section 7443A(b)(3) and Rules 180, 181, and 182. [1]
*429 Respondent determined a deficiency in petitioners' 1986 Federal income tax in the amount of $ 8,549, together with additions to tax under section 6651(a)(1) in the amount of $ 124.11, and under section 6653(a)(1) and (2)[2] in the respective amounts of $ 427.45 and 50 percent of the interest due on the deficiency. The issues for decision are whether petitioners are exempt from paying Federal income tax because of their status as members of the Mohawk Nation, and whether they are subject to additions to tax for late filing of their 1986 return and for negligence. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and accompanying exhibits are incorporated herein by reference. At the time they filed their petition, petitioners resided at the St. Regis Mohawk Indian Reservation, sometimes called Akwesasne, (hereafter *430 the reservation) located within the State of New York at a mailing address of Bombay, New York. Petitioners are husband and wife and filed their 1986 Federal income tax return jointly on May 1, 1987. At all relevant times, petitioners were members of the Mohawk Nation and resided at the reservation. The Mohawk, Oneida, Onondaga, Cayuga, Seneca, and Tuscarora Nations comprise the Iroquois Confederacy of the Six Nations, also known in their language as the Haudenosaunee. We sometimes hereafter refer to the people of these nations collectively as the Iroquois or Haudenosaunee. The lands reserved to the Iroquois are located in upstate New York and stretch across the Canadian border. The Mohawk people are a matriarchal society. The elder mothers of the Mohawk Nation are the ultimate overseers of the affairs of the people. They choose the people who are to lead and represent each of the three Mohawk clans as chiefs. The three Mohawk clans are Wolf, Bear, and Turtle, and membership therein is determined at birth based upon family lineage. The clan mothers also choose the persons who are to act as faith-keepers, i.e., spiritual leaders and organizers of Mohawk ceremonies. Clan *431 chiefs preside over important events such as marriages and funerals. They serve as representatives of the Mohawk people on the Mohawk Council of Chiefs as well as on the Grand Council of the Six Nations which meets annually at Onondaga, New York. They also travel worldwide to attend international conferences of the United Nations as Iroquois/Haudenosaunee representatives. The Haudenosaunee issues its people passports for foreign travel. At least one such passport of a Mohawk chief has been recognized and honored by the governments of the United States, Switzerland, and Colombia. Mohawks traverse the U.S.-Canadian border on reservation lands free from interference by immigration and customs officials of either country. At most, they may be asked to identify themselves as Mohawks by showing an I.D. card issued by the Haudenosaunee. The traditions, history, and ways of the Iroquois nations have been orally passed down from generation to generation through the clan mothers, chiefs, and faith-keepers. The Iroquois refer to this as the "oral tradition". In addition, Native American artifacts crafted by the Iroquois (Haudenosaunee) which are known as wampum belts serve to memorialize *432 certain aspects of the oral tradition considered significant by the Iroquois people. A wampum belt is crafted by stringing rows of various colored beads made from shells into specific patterns. Each unique pattern documents the Iroquois understanding of a specific historical event such as a treaty agreement. One such wampum belt, the Two Row Wampum (Kaswanta), was created in the seventeenth century. The Two Row Wampum depicts two parallel rows of dark colored beads on a background of lighter colored beads extending the length of the belt. It represents the Iroquois understanding of a treaty agreement reached with the Dutch in the early 1600s. The two rows signify the two peoples, Iroquois and Dutch, coexisting peacefully and maintaining separate ways of life free from interference from the other. The Iroquois refer to this as the "chain of friendship". Petitioners' position is that the treaty agreement represented by the Two Row Wampum was incorporated impliedly in each of the treaty agreements upon which they rely. The confederacy of the Six Nations or Iroquois entered into a treaty agreement with the United States in the year 1794 at Canandaigua, New York. That treaty *433 has become known as the Treaty of Canadaigua or the Treaty of the Six Nations, Nov. 11, 1794, 7 Stat. 44. The preamble to the Treaty states that the conference with the Six Nations was "for the purpose of removing from their minds all causes of complaint, and establishing a firm and permanent friendship with them". With respect to the lands reserved to certain of the Six Nations, the Treaty states in articles II and III that the United States acknowledges those lands to be the property of those nations and that the United States "will never claim the same, nor disturb [those nations] or either of the Six Nations, nor their Indian friends residing thereon and united with them, in the free use and enjoyment thereof". Also in 1794, the United States and Great Britain entered into the Treaty of Amity, Commerce, and Navigation, better known as the Jay Treaty, Nov. 19, 1794, 8 Stat. 116, T.S. 105. Article 3 of the Jay Treaty discusses the imposition of import duties upon goods carried between the United States and the British territories to the north (now Canada). It states in part: No Duty of Entry shall ever be levied by either Party on Peltries brought by Land, or Inland Navigation *434 into the said Territories respectively, nor shall the Indians passing or repassing with their own proper Goods and Effects of whatever nature, pay for the same any Impost or Duty whatever. But Goods in Bales, or other large Packages unusual among Indians shall not be considered as Goods belonging bona fide to Indians. Following the War of 1812, the United States and Great Britain negotiated the Treaty of Peace and Amity, also known as the Treaty of Ghent, Dec. 24, 1814, 8 Stat. 218, T.S. 109. The ninth article of the Treaty provides: The United States of America engage to put an end immediately after the ratification of the present Treaty to hostilities with all the Tribes or Nations of Indians with whom they may be at war at the time of such ratification and forthwith to restore to such Tribes or Nations respectively all the possessions, rights and privileges which they may have enjoyed or been entitled to in one thousand eight hundred and eleven previous to such hostilities. * * * During 1986, petitioner husband worked for the Reynolds Metals Company in New York State as a plant mechanic and received compensation in the amount of $ 30,332.31. Petitioner wife worked for the *435 Mohawk Indian Housing Corporation during 1986 as its executive director and received compensation in the amount of $ 18,427.20. Petitioners reported these amounts as income on their 1986 return along with $ 31.03 of interest income. However, they reported no taxable income and no tax. They attached to their return (filed on May 1, 1987) an affidavit declaring an exemption from tax signed by petitioner husband. The affidavit asserts an exemption grounded, inter alia, on the 1794 Treaty of the Six Nations, the Jay Treaty, the Treaty of Ghent, and the U.S. Constitution. It states in conclusion: The Six Nations, the Tribes, Bands, Communities, Families, the individual Indians and those united with them are exempt from taxation by the Department of the Treasury - Internal Revenue Service. Therefore, I, Glenny A. Lazore [petitioner husband] and the Indian of the Mohawk Nation - Six Nation Iroquois Confederacy, solemnly declare that I am exempt from taxation by the Department of the Treasury Internal Revenue Service. This declaration is based upon existing Federal Treaties, Agreement, and Statues [sic] authorizing the exemption of an Indian from payment of Federal income tax. *436 In her notice of deficiency respondent determined that the compensation and interest received by petitioners during 1986 is includable in taxable income under section 61(a). Petitioners reassert in their petition that they are exempt from paying Federal income tax. They concede, however, that if we decide they are subject to Federal income taxation, the computation of tax deficiency in the statutory notice is correct; they make no concessions respecting the determined additions to tax. OPINION As a congressional act of general application, the Internal Revenue Code applies equally to members of the Mohawk Nation as to all others. In Federal Power Commission v. Tuscarora Indian Nation, 362 U.S. 99, 116 (1960), the U.S. Supreme Court stated that "it is now well settled by many decisions of this Court that a general statute in terms applying to all persons includes Indians and their property interests." See also Oklahoma Tax Commission v. United States, 319 U.S. 598, 606-607 (1943); Superintendent of Five Civilized Tribes v. Commissioner, 295 U.S. 418, 419-420 (1935); Choteau v. Burnet, 283 U.S. 691 (1931). *437 Referring to whether certain income of a member of the Creek tribe was taxable under the Code, the Court stated: "The general terms of the taxing act include the income under consideration, and if exemption exists it must derive plainly from agreements with the Creeks or some Act of Congress dealing with their affairs." Superintendent of Five Civilized Tribes v. Commissioner, supra at 420. Consequently, tax exemptions for members of Indian nations are not granted solely by implication. Mescalero Apache Tribe v. Jones, 411 U.S. 145, 156 (1973); Oklahoma Tax Commission v. United States, supra at 606. In the oft cited case of Squire v. Capoeman, 351 U.S. 1, 6 (1956), the Supreme Court stated that "Indians are citizens and that in ordinary affairs of life, not governed by treaties or remedial legislation, they are subject to the payment of income taxes as are other citizens. * * * to be valid, exemptions to tax laws should be clearly expressed." The Capoeman Court went on, however, to weigh this proposition against the longstanding countervailing rule of law that ambiguous language in a treaty *438 or statute is to be construed in favor of the Indians. 351 U.S. at 6-7. It quoted the following from Carpenter v. Shaw, 280 U.S. 363, 367 (1930), which in turn includes a quote from Worcester v. Georgia, 31 U.S. (Peters) 515, 582 (1832): Doubtful expressions are to be resolved in favor of the weak and defenseless people who are the wards of the nation, dependent upon its protection and good faith. Hence, in the words of Chief Justice Marshall: "The language used in treaties with the Indians should never be construed to their prejudice. If words be made use of, which are susceptible of a more extended meaning than their plain import, as connected with the tenor of the treaty, they should be considered as used only in the latter sense." * * * Since the decision in Capoeman, lower courts, including this one, have consistently held that Native Americans are subject to Federal income taxation, unless exemptive language can reasonably be construed from a treaty or statute. See, e.g., Dillon v. United States, 792 F.2d 849 (9th Cir. 1986), affg. Cross v. Commissioner, 83 T.C. 561 (1984); *439 Karmun v. Commissioner, 749 F.2d 567 (9th Cir. 1984), affg. 82 T.C. 201 (1984); United States v. Anderson, 625 F.2d 910 (9th Cir. 1980); Clark v. United States, 587 F.2d 465 (10th Cir. 1978); Holt v. Commissioner, 364 F.2d 38 (8th Cir. 1966), affg. 44 T.C. 686 (1965); Critizer v. United States, 597 F.2d 708 (Ct. Cl. 1979); Hayes Big Eagle v. United States, 300 F.2d 765 (Ct. Cl. 1962); Earl v. Commissioner, 78 T.C. 1014 (1982); Hoptowit v. Commissioner, 78 T.C. 137 (1982), affd. 709 F.2d 564 (9th Cir. 1983); Jourdain v. Commissioner, 71 T.C. 980 (1979), affd. 617 F.2d 507 (8th Cir. 1980). Petitioners argue that, when read together and considered in light of the historical evidence presented to the Court, the language used in the 1794 Treaty of the Six Nations, the Jay Treaty, and the Treaty of Ghent can be reasonably construed to exempt them from the Federal income tax. They alternatively argue that the U.S. Constitution exempts them from the *440 Federal income tax, since they are "Indians not taxed" as that term is used in Article I and the 14th Amendment. See U.S. Const. art. I, sec. 2, cl. 3 and amend. XIV, sec. 2. Respondent contends that the issue has already been decided by this Court in her favor. She cites the following: Maracle v. Commissioner, T.C. Memo. 1991-98; George v. Commissioner, T.C. Memo. 1989-401; and Nephew v. Commissioner, T.C. Memo. 1989-32. Each of these cases involved the question of whether income received by a member of the Iroquois Confederacy of Six Nations is exempt from Federal income tax. All three cases were decided against the taxpayers upon respondent's motion for summary judgment, and in each case the taxpayers relied solely upon the written language of one or more of the treaties referred to above. In the case at bar we heard evidence of both a historical and contemporary nature respecting the meaning of the written language included in these treaties as understood by the Iroquois. We address petitioners' constitutional argument first. Petitioners contend that at the time the Constitution was drafted its framers recognized *441 the various Indian tribes as politically separate from the United States, and that by referring to the category of "Indians not taxed", the framers intended, so long as the tribes remained outside of the polity of the United States, to place them out of reach of the Federal Government's taxing authority. Petitioners presented evidence in support of their claim that the Iroquois people have remained outside the polity of the United States. The Iroquois continue to reside on the lands reserved to them by treaty; they have retained their own cultural ways of life and system of self-governance; they move freely across the U.S.-Canadian border on reservation lands; and their passports are accepted by at least some foreign governments. Petitioners do not consider themselves citizens of the United States. While these factors suggest, at least to some degree, that the Iroquois are recognized as an autonomous people, petitioners point to no authority for their contention that by using the term "Indians not taxed" the framers of the Constitution intended to exempt from the taxing power of the United States those Indians remaining outside the polity of the United States. They rely solely *442 upon the conclusion to that effect drawn by their expert witness. Although we acknowledge the witness as a qualified expert on the history of the Iroquois, we do not accept his legal conclusions as to the meaning of the Constitution. Petitioners also quote from Elk v. Wilkins, 112 U.S. 94, 98-100 (1884), wherein the Supreme Court referred to the Indians as "distinct political communities". We find nothing in that quotation, however, suggesting that under the Constitution Indians are exempt from the taxing power of the United States. Petitioners' argument has been previously considered by this and other courts. The constitutional reference called into question by petitioners is merely -- an apportionment provision designed to establish the method of computing the number of representatives for each State and determine apportionment of direct taxes among the States. The phase "Indians not taxed," when viewed in context, is clearly descriptive, describing the fact that some Indians are not taxed by the State in which they reside and should, therefore, be excluded from enumeration of its population. It does not restrain the Federal Government from taxing *443 Indians. [Fn. ref. omitted; emphasis supplied. Jourdain v. Commissioner, supra at 988.] See also Dillon v. United States, supra at 852 n.1; Cross v. Commissioner, supra at 561, 566-567 n.9. We accordingly reject petitioners' constitutional argument. Petitioners' further argument is that an exemption from the Federal income tax is to be found in the above mentioned treaties. The language from those treaties upon which petitioners rely has been excerpted and set forth above in our findings of fact. Petitioners provide a historical backdrop to the signing of these treaties. From the early 1600s, the Iroquois and the newly arrived Dutch settlers forged a chain of friendship which the Iroquois commemorated through the Two Row Wampum. The Iroquois understood their relationship with the European settlers to be one in which the two peoples coexist peacefully and separately, without interference by one into the other's way of life. The Iroquois continue to this day to live their separate way of life and in many respects are viewed as an autonomous people. Petitioners argue that this evidence sheds light *444 on the Iroquois understanding of the subject treaty agreements. They maintain that the Iroquois understood the agreements to mean that their lives would not be infringed upon in any way by the United States. Although no income tax existed at the time of the signing of the treaties, we hear petitioners to say that the imposition of an income tax is prohibited by the treaties as an infringement upon their way of life. The Jay Treaty does in fact make reference to a limited prohibition on taxation of the Iroquois. Under the Article 3 provision cited by petitioners, Iroquois crossing what is not the U.S.-Canadian border are not required to pay any impost or duty upon their goods or effects to either the United States or Great Britain. Petitioners argue that, at the time of the signing of the treaty, such a tax was an important source of revenue to the United States and is analogous to the contemporary Federal income tax. The cited provision also states, however, that with respect to large quantities of goods carried by Indians, such goods shall not be considered as belonging to Indians and therefore will be subject to duty. We think it clear that the intended effect of the cited *445 Jay Treaty provision was to allow the Iroquois to freely traverse the border without interference so long as they were not carrying goods in commerce. Petitioners have demonstrated that to this day they are free to cross the border without unnecessary interference. However, this is not to say that a broad tax exemption was contemplated; the provision clearly does not exempt goods carried by the Iroquois where the apparent purpose is for trading in commerce. The various treaty agreements upon which petitioners rely have been considered in conjunction with the substantial historical and other evidence presented by petitioners. In so considering the evidence and treaties, we are mindful of the rule of construction that the language in a treaty or statute is to be construed favorably towards Indians. Even so, we are unable to construe the language of these treaties as a restriction on the taxing authority of the United States to impose a tax not yet in existence. See Dillon v. United States, 792 F.2d at 854. To do so would unreasonably stretch the plain meaning of the words expressed within the treaties. We hold that petitioners are not exempt from paying Federal *446 income taxes. Respondent also determined that petitioners are subject to additions to tax for late filing of their return and for negligence. Section 6651(a)(1) imposes an addition to tax for the failure to file a return by the due date unless such failure was due to reasonable cause and not due to willful neglect. Petitioners have agreed by stipulation that they filed their return on May 1, 1987. The due date of their return was April 15, 1987. Petitioners have provided no explanation for the failure to file their return on time. We accordingly hold that they are subject to the addition to tax under section 6651(a)(1). Section 6653(a)(1)(A) imposes an addition to tax equal to 5 percent of the underpayment of tax if any portion of the underpayment is due to negligence. Section 6653(a)(1)(B) imposes a further addition to tax equal to 50 percent of the interest due on the portion of the underpayment attributable to negligence. As used in section 6653(a)(1), negligence is defined as a lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). Petitioners *447 have the burden of proving they did not act negligently. Rule 142(a); Bixby v. Commissioner, 58 T.C. 757, 791 (1972). We have held that the late filing of a return constitutes negligence under section 6653(a), since it automatically results in an underpayment of the correct tax and is contrary to what a reasonable and ordinarily prudent person would do under the circumstances. See Emmons v. Commissioner, 92 T.C. 342, 348-351 (1989), affd. 898 F.2d 50 (5th Cir. 1990). Here, petitioners untimely filed their return and have provided no explanation for the failure to file their return on time. We accordingly hold that they were negligent and are liable for the additions to tax determined by respondent under section 6653(a)(1)(A) and (B). Decision will be entered for respondent. Footnotes
1. Unless otherwise indicated, section references are to the Internal Revenue Code in effect for the year at issue. Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Respondent's notice of deficiency cites sec. 6653(a)(1) and (2)↩; however, the applicable sec. reference for the year at issue is 6653(a)(1)(A) and (B).