**UNITED STATES of America**

v.

**Martin Anthony NEPTUNE.**

**Crim. No. H–52.**

United States District Court,
D. Connecticut.

Jan. 27, 1972.

B. Blair Crawford, Asst. U. S. Atty., Stewart H. Jones, U. S. Atty., Hartford, Conn., for plaintiff.

Michael P. Berman, Hartford, Conn., for defendant.

## RULING ON DEFENDANT'S MOTION TO DISMISS THE INDICTMENT

CLARIE, District Judge.

The defendant, Martin Anthony Neptune, has moved to dismiss the indictment pursuant to Rule 12(b), Fed.R. Crim.P., because the place where he resides and where he was arrested is not in the United States and this Court is without jurisdiction; furthermore, he is not now and never has been a citizen or a national of the United States and hence is not subject to the Military Selective Service Act of 1967, as provided under 50 U.S.C. § 454(a). The Court finds that the claims which he has made are without legal merit and therefore denies his motion to dismiss the indictment.

The legal issue presented is whether the defendant, a Penobscot Indian, is subject to 50 U.S.C. § 454(a) of the Military Selective Service Act of 1967. That statute provides that "every male citizen of the United States," between the ages of 18½ and 26 years is "liable for training and service in the Armed Forces of the United States."

Neptune was born on July 12, 1950, in Old Town, Maine, a community located immediately adjacent to Indian Island,

Penobscot Indian Territory. Both of Neptune's parents are full-blooded Indians, who were residents of Indian Island at the time of Martin Neptune's birth, and they continued to reside there until they moved in 1967. On September 24, 1968, the defendant registered with Local Selective Service Board No. 3, in Hartford, Connecticut, and gave as his home address, 160 School Street, Manchester, Connecticut. On November 12, 1968, he was classified 1–A; and on July 30, 1970, a notice of change of address was received for the defendant, indicating his new place of residence to be 111 Oak Hill Street, Indian Island, Maine.[1]

The defendant Neptune represents that these area locations are not and never have been "in the United States" for purposes of relevant citizenship and therefore he is not in fact and has never elected to become a citizen of the United States. To support this claim, he contends that the Penobscot Indian Tribe was never conquered by the United States and that it never voluntarily ceded its lands or sovereignty to the federal government. He argues further that the several treaties between the Penobscot tribe of Indians and the State of Massachusetts and subsequently the State of Maine,[2] which purport to transfer to those states, the land on which the community of Old Town, Maine, was built, and to thus preserve Penobscot Indian Island for the Penobscot Indian Tribe, are invalid, because these agreements are violative of these constitution-

al provisions, which only authorize the President to make treaties with the advice and consent of the Senate, (Art. II, § 2, Cl. 2,) and expressly deny to the states themselves the sovereign power to enter into treaties, (Art. I, § 10, Cl. 1).[3] The defendant concludes that these lands which were attempted to be ceded to the states are in fact not a part of either the State of Maine or the United States, but still remain the territories of the Penobscots, under a separate and distinct tribal sovereignty.[4]

The Court's disposition of this case on the grounds of national citizenship rather than tribal property rights, makes it unnecessary to determine at this time, the constitutional validity of those treaties insofar as they affect tribal land ownership between the Penobscots and the states concerned. Inasmuch as the defendant was born in 1950, his factual status of national citizenship is governed by the Nationality Act of 1940, because that law was in effect at the time of his birth. That statute provides in part:

"The following shall be nationals and citizens of the United States at birth:

.    .    .    .    .    .

"(b) A person born in the United States to a member of an Indian, Eskimo, Aleutian, or other aboriginal tribe: *Provided,* That the granting of citizenship under this subsection shall not in any manner impair or otherwise affect the right of such person

---

1. Affidavit of Palma Belfiore, Supervisor of Local Board No. 3, filed January 27, 1972.

2. By the Act of Separation of 1820, the new State of Maine undertook to fulfill all existing treaty obligations of the State of Massachusetts owed to the Indian Tribes within its borders. The defendant represents that although this compact of separation remains a part of the Maine Constitution, it is no longer printed. Congress ratified the Act of Separation by the Act of March 3, 1820, Ch. 19, 3 Stat. 544.

3. The defendant also maintains that these treaties are violative of 25 U.S.C. § 177 and its predecessors, which statutes prohibit the transfer of Indian lands unless pursuant to federal authority.

4. For a thorough discussion of the relationship between the States of Maine and Massachusetts and the Passamaquoddy Tribe, a relationship similar to that of the Penobscots with those states, *see* O'Toole and Tureen, State Power and the Passamaquoddy Tribe: "A Gross National Hypocrisy?"; 23 Maine L.Rev. 1 (1971); *also see*, "The Ancient Penobscot," Maine Historical Society, Vol. 7, 1786–1796,

or tribal or other property." 8 U.S.C. § 601(b), (1946).[5]

The geographical area, "United States" was defined under this Act as follows:

"The term 'United States' when used in a geographical sense means the continental United States, Alaska, Hawaii, Puerto Rico, and the Virgin Islands of the United States." 8 U.S.C. § 501(d) (1946).[6]

The issue clearly posed is whether the defendant was born "in the United States" within the meaning of the Nationality Act of 1940. If Neptune was born "in the United States," then he is by statutory law an American citizen, subject to the obligations of that citizenship. The decision by the Court of Appeals in this Circuit in Ex parte Green, 123 F.2d 862 (2d Cir. 1941), cert. denied sub nom., Green v. McLaren, 316 U.S. 668, 62 S.Ct. 1035, 86 L.Ed. 1744 (1942), is dispositive of the relevant issues. The appellant in that case was an Onondaga Indian, a member of the Six Nations of Indians or Iroquois Confederacy and he claimed that the Six Nations had never been conquered by the United States, and that their relationship to the United States was that of an independent nation, by virtue of several treaties between the Six Nations and the United States. Green claimed that the tribal sovereignty acknowledged by the United States in those treaties had been preserved intact by the Onondaga Indians, and he therefore could not be classified as a citizen within the meaning of the Selective Service Act. He also contended that the attempt by Congress to confer citizenship upon Indians by the Nationality Act of 1940 was unconstitutional as applied to him, because it violated the established treaty rights of the Six Nations Tribes.

The Court of Appeals found that even if the claimed treaty status of his Indian tribe were valid, the Nationality Act of 1940 superseded these treaties and the Act "unequivocally made Green a citizen." It pointed out that the provisions in the Nationality Act to the effect that such citizenship shall not impair the Indians' rights to tribal or other property [7] underscored the congressional intent to "impose all other obligations of citizenship." The Court unequivocally found that Green was subject to the Selective Service Act.

"Where a domestic law conflicts with an earlier treaty, that the statute must be honored by the domestic courts has been well established at least since the Head Money cases, 1884, 112 U.S. 580, 5 S.Ct. 247, 28 L. Ed. 798 . . . . Whatever doubt there might possibly be concerning the 1924 statute, because of its title, (An Act authorizing the Secretary of the Interior to issue certificates of citizenship to Indians) the 1940 statute unequivocally made Green a citizen. The provision in that Act that 'the granting of citizenship under this subsection shall not in any manner impair or otherwise affect the right of such person to tribal or other property,' rather hurts than helps Green's case; for Congress, by expressly excepting property rights, emphasized its intention to impose all other obligations of citizenship. Accordingly, since the subsequently enacted Selective Service Act included 'every male citizen' within its terms, 50 U.S.C.A. Appendix, § 303(a), it is impossible to reach any conclusion other than that Congress intended not to except such persons as Green." Ex parte Green, 123 F.2d 862, 863–864 (2d Cir. 1941).

See also, Tag v. Rogers, 105 U.S.App.D.C. 387, 267 F.2d 664 (1959); and Brandon v. Denton, 302 F.2d 404, 414 (5th Cir. 1962).

The *Green* decision is applicable and controlling here. The defendant Neptune, like Green, asserts he is not a citizen of the United States, because he is a

---

5. This provision was re-enacted in its entirety in 1952, 8 U.S.C. § 1401(a) (2).

6. This definition was substantially unchanged in the 1952 Act, 8 U.S.C. § 1101 (38).

7. This same provision is a part of the present law, 8 U.S.C. § 1401(a) (2).

member of an independent Indian nation, a separate sovereignty. That case decided that even if there were such an existing treaty, that would not foreclose the lawful operation of the subsequently enacted Nationality Act of 1940, making all Indians born in the United States citizens.

There was no evidence introduced here to demonstrate the existence of any treaty relationship between the Penobscots and the United States; hence the findings in the instant case must follow *a fortiori* from *Green*. Since it has already been determined that the Nationality Act confers a citizenship status upon Indians, even though they had in fact concluded a treaty with the United States, reserving sovereignty to said Indian Tribe, certainly it must logically follow that the same Nationality Act confers citizenship upon Indians, who assert their independent sovereignty, based upon the circumstance that the United States never negotiated any treaty with them.

"Any doubt which might have existed concerning the citizenship of Indians or members of Indian tribes in this country was set at rest by the adoption of the Nationality Code of 1940. That act provided, 8 U.S.C.A. § 601:

'The following shall be nationals and citizens of the United States at birth:

. . .

'(b) A person born in the United States to a member of an Indian, Eskimo, Aleutian, or other aboriginal tribe: Provided, that the granting of citizenship under this subsection shall not in any manner impair or otherwise affect the right of such person or tribal or other property.'

"The main controversy as to the citizenship status of Indians arose out of the opinion of the Supreme Court of the United States in the case Elk v.

Wilkins, 112 U.S. 94, 5 S.Ct. 41, 43, 28 L.Ed. 643, decided November 3, 1884. It was there held that a person born in the United States to members of an Indian Tribe had not acquired citizenship of the United States at birth not having been born 'subject to the jurisdiction thereof,' within the meaning of the Fourteenth Amendment. Since that time the Congress passed six Acts conferring citizenship upon Indians. The Act of June 2, 1924, 43 Stat. 253, 8 U.S.C.A. § 3, was the last of these and it provided: 'All non-citizen Indians born within the territorial limits of the United States be, and they are hereby, declared to be citizens of the United States.'

"Since this act did not purport to change the Tribal relationship of Indians of the United States, it was not clear that it was applicable to citizens born after its passage and fear was expressed that it was limited to non-citizen Indians born within the territorial limits of the United States who were living on the effective date of the act and who by it were made citizens of the United States. The Congressional purpose of subsection (b) was to make clear that such persons are born citizens of the United States." Totus v. United States, 39 F.Supp. 7, 11 (E.D.Wash.S.D.1941). *See also*, Albany v. United States, 152 F.2d 266 (6th Cir. 1945); Williams Western Shoshone Nation of Indians v. United States, 406 F.2d 704 (9th Cir. 1969), cert. denied, 394 U.S. 959, 89 S. Ct. 1307, 22 L.Ed.2d 561 (1969); Petition of Moser, 182 F.2d 734, 735 (2d Cir. 1950).

While the full legal relationship between the United States and the Penobscot Tribe, as it relates to the Massachusetts and the State of Maine treaties of 1818, 1820, and 1843, respectively, may still remain undetermined in some of its aspects,[8] on the issue of national citi-

---

8. Counsel represented that legislation had been proposed and is now pending before

Congress to enact whatever relief may be appropriate concerning the Penobscots and

zenship, there is no question but that Congress intended by the Nationality Act of 1940 to make all persons American citizens, who were born after that date within the continental United States, including members of Indian tribes.

When defining "United States," Congress defined what comported with the realities of geographic existence of "continental United States" and that included all of what is now the State of Maine.

"By the treaty which concluded the war of our revolution, Great Britain relinquished all claim, not only to the government, but to the 'propriety and territorial rights of the United States,' whose boundaries were fixed in the second article. By this treaty, the powers of government, and the right to soil, which had previously been in Great Britain, passed definitively to these states. We had before taken possession of them, by declaring independence; but neither the declaration of independence, nor the treaty confirming it, could give us more than that which we before possessed, or to which Great Britain was before entitled. It has never been doubted, that either the United States, or the several states, had a clear title to all the lands within the boundary lines described in the treaty, subject only to the Indian right of occupancy, and that the exclusive power to extinguish that right, was vested in that government which might constitutionally exercise it." Johnson v. McIntosh, 21 U.S. (8 Wheat) 543, 584–585, 5 L.Ed. 681 (1823).

*Also see,* United States v. Kagama, 118 U.S. 375, 6 S.Ct. 1109, 30 L.Ed. 228 (1886).

The Court finds that Neptune was born in the United States, that he is subject to its jurisdiction as provided in

other Indian Tribes. However, a review of the legislation referred to, Senate Bill No. 1460, 1st Session, 92nd Congress, simply makes available to certain organized tribes of Indians residing on Indian res-

18 U.S.C. § 5; he is an American citizen, he was arrested pursuant to 18 U.S.C. § 3041 and Rule 4(c) Fed.R.Crim. P., on this charge within the continental United States and he is subject to the terms of the Military Selective Service Act of 1967.

The motion to dismiss the indictment must be denied.

So ordered.

ervations established under state law certain benefits, care or assistance for which federally recognized Indian Tribes qualify as recipients.