Glenny A. LAZORE, Carol L. Lazore, Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE SERVICE.

No. 92–7667.

United States Court of Appeals, Third Circuit.

Argued Sept. 9, 1993.

Decided Dec. 6, 1993.

---

* Honorable Louis H. Pollak, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

Peter Goldberger (argued), James H. Feldman, Jr., Pamela A. Wilk, Law Office of Peter Goldberger, Philadelphia, PA, for appellants.

Michael L. Paup, Acting Asst. Atty. Gen., Gary R. Allen, Richard Farber, Edward T. Perelmuter, David A. Shuster (argued), U.S. Dept. of Justice, Tax Div., Washington, DC, for appellee.

Before: STAPLETON, ROTH and LEWIS, Circuit Judges.

## OPINION OF THE COURT

ROTH, Circuit Judge:

This appeal arises from the United States Tax Court's determination that appellants, Glenny and Carol Lazore, were not exempt from paying federal income taxes and that they were subject to both late filing and negligence penalties on the basis of their unexcused two-week delay in filing their return. On December 23, 1988, the Commissioner of the Internal Revenue Service sent the Lazores a notice of deficiency concerning their 1986 taxable year. The notice alleged a deficiency in the amount of $8549.00 and claimed additions in the amounts of $124.11 for late filing and $427.45 for negligence. On March 22, 1989, the Lazores filed a petition with the Tax Court contesting the Commissioner's deficiency determination. They filed an amended petition on June 16, 1989, in which they claimed that, as Mohawk Indians, they were exempt from federal income tax under various treaties between the Six Nations Confederacy and the United States. As noted above, the Tax Court, following a trial, found that the Lazores were not exempt from taxation and upheld the late filing and negligence penalties. On August 17, 1992, the Lazores moved the Tax Court to revise its decision so as to delete the determination that additions to tax are due based on negligence. The Tax Court denied this motion, and the Lazores filed their notice of appeal on December 2, 1992.

Because we believe that the Tax Court correctly determined that the treaties relied upon by the Lazores do not support their claim of an exemption from the federal income tax, we will affirm its decision to that extent. We believe, however, that the Tax

Court incorrectly applied the negligence penalty, and we will therefore reverse its determination that the Lazores are subject to the addition to tax for negligence.

## I.

Appellants Glenny and Carol Lazore are residents of the St. Regis Mohawk Indian Reservation, located within the State of New York. The Mohawk Nation, along with the Oneida, the Seneca, the Onondaga, the Cayuga and the Tuscarora Nations, is part of the Six Nations Confederacy. The Six Nations are also known as the Iroquois or Haudenosaunee ("the People of the Long House"). We shall refer to them as the Haudenosaunee. The Haudenosaunee Nation exists within the territorial limits of the United States, but in many ways functions as a separate government. It has its own governing bodies, known as the Grand Council and the Council of Chiefs, and issues passports which are recognized by the United States and other nations. The Haudenosaunee may travel freely between the United States and Canada on identification cards issued by the Haudenosaunee Nation. Both Mr. and Ms. Lazore consider themselves to be citizens of the Mohawk Nation and not citizens of the United States.

Appellants are husband and wife; they filed their joint 1986 federal income tax return on May 1, 1987. During 1986, Mr. Lazore worked for the Reynolds Metals Company in New York State as a plant mechanic and received compensation in the amount of $30,332.31. Ms. Lazore worked for the Mohawk Indian Housing Corporation as its executive director and received compensation in the amount of $18,427.20. Appellants reported these amounts as income on their tax return along with $31.03 of interest income. However, they reported no taxable income and no tax. They attached an affidavit to their return in which they declared that they were exempt from tax based on the 1794 Treaty of Canandaigua, the Jay Treaty, the Treaty of Ghent, and the U.S. Constitution.

## II.

The United States Tax Court had subject matter jurisdiction of this case under I.R.C. §§ 6213(a), 6214(a), and 7442. This court has jurisdiction over appeals from the Tax Court under I.R.C. § 7482(a), and venue pursuant to I.R.C. § 7482(b), since the parties by stipulation have designated this court to review the Tax Court's decision. The notice of appeal was timely filed under I.R.C. §§ 7483, 7502(a)(1), and Fed.R.App.P. 13. Because all issues considered in this case are matters of law, this court has plenary review.

## III.

The Supreme Court in 1886 stated: "[t]he relation of the Indian tribes living within the borders of the United States, both before and since the Revolution, to the people of the United States has always been an anomalous one and of a complex character." *United States v. Kagama*, 118 U.S. 375, 381, 6 S.Ct. 1109, 1112, 30 L.Ed. 228 (1886). That statement applies with equal force to the more specific questions of the scope and interpretation of treaties between the various Indian nations and the United States. The legal status of these treaties has evolved over the last 150 years. In 1832 the Supreme Court noted:

> The words "treaty" and "nation," are words of our own language, selected in our diplomatic and legislative proceedings, by ourselves, having each a definite and well-understood meaning. We have applied them to Indians, as we have applied them to the other nations of the earth; they are applied to all in the same sense.

*Worcester v. Georgia*, 31 U.S. (6 Pet.) 515, 559–60, 8 L.Ed. 483 (1832). Forty years later, in *Holden v. Joy*, 84 U.S. (17 Wall.) 211, 242–43, 21 L.Ed. 523 (1872), the Court reaffirmed the notion that treaties with Indian nations are to be treated the same as treaties with other nations, despite the unique status occupied by Indian nations vis-a-vis the United States. Yet in 1912 the Court stated that Indian tribes "have been regarded as dependent nations, and treaties with them have been looked upon not as contracts, but as public laws which could be abrogated at the will of the United States."

*Choate v. Trapp*, ·224 U.S. 665, 671, 32 S.Ct. 565, 567, 56 L.Ed. 941 (1912). In addition ·to adopting· a conception of these treaties distinct from that of treaties with separate nations, the Court over this period fashioned a special set of rules to be used in .interpreting these treaties. These rules, which will be discussed in greater detail below, stem largely from the unique nature of the relationship between the Indian nations and the United States.

The· notion that Congress has the power to unilaterally abrogate provisions of treaties with Indians is firmly established. *See Rosebud Sioux Tribe v. Kneip*, 430 U.S. 584, 587–88, 97 S.Ct. 1361, 1363–64, 51 L.Ed.2d 660 (1977); *Lone Wolf v. Hitchcock*, 187 U.S. 553, 23 S.Ct. 216, 47 L.Ed. 299 (1903). Consistent with this power, Congress has repeatedly asserted its legislative jurisdiction over Indians without regard to whether any treaty provisions concerned the subject of the law. Beginning with the Seven Major Crimes Act of 1885, for example, and continuing through 1988, Congress has removed major criminal jurisdiction from all Indian tribes. *See, e.g.,* Ch. 341, § 9, 23·Stat. 385; 18 U.S.C. §§ 1153 (enacted in 1948, and amended in 1949, 1966, 1968, 1976, 1984, 1986, and 1988) and 3241 (enacted in 1948 and amended in 1966 and 1976); *United States v. Walkingeagle*, 974 F.2d 551 (4th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1818, 123 L.Ed.2d 449 (1993). Similarly, the Indian Civil Rights Act of 1968, 82 Stat. 77, 25 U.S.C. §§ 1301–41, specifies the maximum penalties which tribal courts may impose upon. convicted defendants, 25 U.S.C. § 1302(7), and sets out a list of rights—including six-person juries and review of tribal court detention orders by federal District Courts through issuance of writs of habeas corpus—that must be provided to participants in tribal criminal proceedings, 25 U.S.C. §§ 1302, 1303. Congress has also legislated frequently with respect to the right of all Indians within the United States to alienate reservation lands by lease or transfer. *See, e.g.,* Indian Intercourse Act of July 22, 1790, 1 Stat. 137; Indian Intercourse Act of March 1, 1793, 1 Stat. 469, 472; Act of February·28, 1891, § 3, 25 U.S.C. § 397; Act of June 18, 1934; 25 U.S.C. § 451 *et seq.*

Related to the power to abrogate treaty provisions is the Supreme Court's holding that "a general statute applying to all persons includes Indians and their property interests." *Federal Power Comm'n v. Tuscarora Indian Nation*, 362 U.S. 99, 116, 80 S.Ct. 543, 553, 4 L.Ed.2d 584 (1960). Thus, for example, Congress has successfully asserted the power to draft Indians. *See, e.g., United States v. Cook*, 505 F.2d 1124, 1125 n. 1 (2d Cir.1974); *Ex parte Green*, 123 F.2d 862 (2d Cir.1941), cert denied sub nom. *Green v. McLaren*, 316 U.S. 668, 62 S.Ct. 1035, 86 L.Ed. 1744 (1942).

In the area of taxation, Congress has passed neither a statute specifically abrogating the provisions of Indian treaties nor a statute of general application that has the effect of abrogating Indian treaties. To be sure, § 1 of the Internal Revenue Code is a general statute which subjects the income of every individual to taxation. Furthermore, this tax extends to "all income from whatever .source derived." I.R.C. § 61(a). However, provisions of the income tax law are to be applied "with due regard to any treaty obligation of the United States which applies to such taxpayer." I.R.C. § 894(a)(1). Thus, "in ordinary affairs of life, *not governed by treaties* or remedial legislation, [Indians] are subject to the payment of income taxes as are other citizens." *Squire v. Capoeman*, 351 U.S. 1, 6, 76 S.Ct. 611, 615, 100 L.Ed. 883 (1956) (emphasis added).

Despite the fact that the United States stopped dealing with Indians by treaty long before the establishment of the income tax,[1]

---

1. · An income tax was first imposed during the Civil War, but was repealed afterwards. Boris·I. Bittker & Lawrence Lokken, Federal Taxation of Income, Gifts and Estates 1–4 (1989). The next federal income tax statute was passed in 1894, and was held unconstitutional in *Pollock v. Farmers' Loan & Trust Co.*, 157 U.S. 429, 15 S.Ct. 673, 39 L.Ed. 759 (1895). The Sixteenth Amendment to the United States Constitution, authorizing the income tax, became effective on February 25, 1913.

Congress discontinued dealing with the Indians by treaty in the Appropriations Act of March 3, 1871, Ch. 120, § 1, 16 Stat. 544, 566 (codified at 25 U.S.C. § 71). Nevertheless, "the federal government continued to deal with Indian tribes after 1871 by agreements, statutes, and executive orders that had legal ramifications similar to

the Supreme Court has held that a treaty-based tax exemption must be supported by the text of a treaty. In *Superintendent of Five Civilized Tribes v. Commissioner*, 295 U.S. 418, 55 S.Ct. 820, 79 L.Ed. 1517 (1935), the Court, faced with a claim that an Indian's investment income was exempt from taxation, stated that "[t]he general terms of the taxing act include the income under consideration, and if exemption exists it must derive plainly from agreements with the Creeks or some Act of Congress dealing with their affairs." *Id.* at 420, 55 S.Ct. at 822. Similarly, in *Choteau v. Burnet*, 283 U.S. 691, 51 S.Ct. 598, 75 L.Ed. 1353 (1931), the Court concluded that "[n]o provision in any of the treaties referred to ... has any bearing upon the question of the liability of an individual Indian to pay tax upon income derived by him from his own property." *Id* at 694, 51 S.Ct. at 600. We interpret the Court's statement that an exemption must "derive plainly" from a treaty, together with its conclusion in *Choteau* that treaties cannot support an exemption without a "provision" concerning "the liability of an individual to pay tax upon income," to stand for the proposition that an exemption must be rooted in the text of a treaty. Furthermore, because all Indian treaties were entered into long before the passage of the income tax, the fact that the parties to a treaty did not negotiate with the federal income tax in mind is immaterial. As such, silence as to matters of taxation will never be sufficient to establish an exemption.

At first glance, these doctrines appear to conflict to such an extent as to nullify one another. Since there was no income tax contemplated when these treaties were drafted, it is virtually inconceivable that any treaty would contain an exemption to the tax. Thus, short of a provision creating an exemption from all taxation, there would appear to be no way for a treaty to contain language that could support an exemption from the income tax. The Court has avoided this result by crafting a special set of rules to be used in interpreting treaties between the United States and Indian nations. In general, "doubts concerning the meaning of a treaty with an Indian tribe should be resolved in

favor of the tribe." *Oregon Dept. of Fish & Wildlife v. Klamath Indian Tribe*, 473 U.S. 753, 766, 105 S.Ct. 3420, 3428, 87 L.Ed.2d 542 (1985).

> The language used in treaties with the Indians should never be construed to their prejudice. If words be made use of, which are susceptible of a more extended meaning than their plain import, as connected with the tenor of the treaty, they should be considered as used only in the latter sense.... How the words of the treaty were understood by this unlettered people, rather than their critical meaning, should form the rule of construction.

*Worcester v. Georgia*, 31 U.S. (6 Pet.) 515, 582, 8 L.Ed. 483 (1832). Furthermore, the words of such treaties

> must be construed, not according to their technical meaning, but "in the sense in which they would naturally be understood by the Indians." *Jones v. Meehan*, 175 U.S. 1, 11 [20 S.Ct. 1, 5, 44 L.Ed. 49 (1899) ].

> Whatever was the meaning of the present exemption clause at the time of its adoption must be taken to be its effect now, since it may not be narrowed by any subsequently declared intention of Congress.

*Carpenter v. Shaw*, 280 U.S. 363, 367, 50 S.Ct. 121, 122, 74 L.Ed. 478 (1930). *See also McClanahan v. Arizona State Tax Comm'n*, 411 U.S. 164, 174–75, 93 S.Ct. 1257, 1263, 36 L.Ed.2d 129 (1973); *Choctaw Nation v. Oklahoma*, 397 U.S. 620, 631, 90 S.Ct. 1328, 1334, 25 L.Ed.2d 615 (1970). These precepts are an acknowledgement of the fact that the United States was "the party with the presumptively superior negotiating skills and superior knowledge of the language." *Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 675–76, 99 S.Ct. 3055, 3069, 61 L.Ed.2d 823 (1979).

The effect of these rules of interpretation is to make it possible for language that could not have been concerned with the income tax to nevertheless create an exemption from it. An example is the language at issue in *Hoptowit v. Commissioner of Internal Revenue*,

treaties." Felix S. Cohen, Handbook of Federal Indian Law 107 (1982).

709 F.2d 564 (9th Cir.1983). In *Hoptowit* the taxpayer argued that the Treaty with the Yakimas of 1855, 12 Stat. 951, which provided that a certain tract of land was set apart "for the exclusive use and benefit of said confederated tribes and bands of Indians," expressed a tax exemption as clearly as was possible before the income tax existed. 709 F.2d at 566. The Ninth Circuit, though it held that the treaty did not create a blanket exemption from the income tax, allowed that the language might create an exemption from taxation on income derived directly from the land. *Id.*

■ Consistent with this reasoning, we accept the approach adopted by the Eighth Circuit. In *Holt v. Commissioner*, 364 F.2d 38, 40 (8th Cir.1966), *cert. denied*, 386 U.S. 931, 87 S.Ct. 952, 17 L.Ed.2d 805 (1967), that court concluded that the principle that Indian treaties should be liberally construed to favor the Indians "comes into play only if such ... treaty contains language which can reasonably be construed to confer income exemptions." This formulation gives appropriate weight to the notion that a treaty-based tax exemption must have a textual basis and accounts for the interpretive rules applicable to Indian treaties. We specifically reject the Ninth Circuit's requirement that a treaty contain a "definitely expressed exemption," *Confederated Tribes of Warm Springs Reservation v. Kurtz*, 691 F.2d 878, 882 (9th Cir. 1982), *cert. denied*, 460 U.S. 1040, 103 S.Ct. 1433, 75 L.Ed.2d 792 (1983), because we believe that it insufficiently accounts for these rules of liberal construction.[2]

### IV.

■ We must now consider whether any of the treaties on which the Lazores rely contain a textual basis for an exemption from the federal income tax. The Lazores bottom their claim of exemption primarily on provisions of the Treaty of Canandaigua, 7 Stat. 44 (1794), supported by the Treaty of Amity,

Commerce, and Navigation, known as the Jay Treaty, 8 Stat. 116 (1794), and the Treaty of Ghent, 8 Stat. 218 (1815). The relevant sections of the Treaty of Canandaigua provide as follows:

### ARTICLE II.

The United States acknowledge the lands reserved to the Oneida, Onondaga, and Cayuga Nations in their respective treaties ... to be their property; and the United States will never claim the same, nor disturb them or either of the Six Nations, nor their Indian friends residing thereon and united with them, in the free use and enjoyment thereof ...

### ARTICLE III.

... Now, the United States acknowledge all the land within the aforementioned boundaries, to be the property of the Seneka nation: and the United States will never claim the same, nor disturb the Seneka nation, nor any of the Six Nations, or of their Indian friends residing thereon and united with them, in the free use and enjoyment thereof ...

### ARTICLE IV.

The United States having thus described and acknowledged what lands belong to the Oneidas, Onondagas, Cayugas and Senekas, and engaged never to claim the same, not to disturb them, or any of the Six Nations, or their Indian friends residing thereon and united with them in free use and enjoyment thereof: Now, the Six Nations, and each of them, hereby engage that they will never claim any other lands within the boundaries of the United States; nor ever disturb the people of the United States in the free use and enjoyment thereof.

---

2. We also believe that the Ninth Circuit in *Kurtz* misread Supreme Court precedent. The Ninth Circuit's "definitely expressed exemption" standard was directly quoted from *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 155, 93 S.Ct. 1267, 1274, 36 L.Ed.2d 114 (1973). *Mescalero*, however, was concerned only with exemptions conferred by the Internal Revenue Code. Treaty-based exemptions are of an entirely different nature, and a requirement that they be "definitely expressed," we believe, gives too little regard to the doctrine that Indian treaties be liberally construed to favor the Indians.

In particular, the Lazores point to the treaty's statement that the United States and its citizens will not "disturb ... any of the Six Nations, or their Indian friends residing thereon and united with them, in the free use and enjoyment" of their lands.

At trial the Lazores presented a substantial amount of uncontradicted historical evidence concerning the Haudenosaunee understanding of the treaty's meaning. Witnesses stated that the Haudenosaunee know, through their oral tradition, that the treaty recognizes them as a separate nation over which the United States has no power, of taxation or otherwise. Kevin Deer, an Iroquois faithkeeper, and Jake Swamp, a Mohawk Chief, testified that the Haudenosaunee understanding of the treaty is embodied in the Two Row Wampum, a belt consisting of two parallel rows of dark colored beads on a background of lighter colored beads. The two rows signify the two peoples—Indian and European—coexisting peacefully, neither imposing their laws or religion on the other. The Two Row Wampum initially reflected the principles of the agreement between the Haudenosaunee and the Dutch in 1645 to remain separate peoples. These principles became known to the Haudenosaunee as the "chain of friendship," and, in the view of the Haudenosaunee, were the basis for treaties with France, Great Britain, and the United States, including the Treaty of Canandaigua.

Robert Venables, Ph.D., a Senior Lecturer in the American Indian Program at Cornell University, also testified concerning the Haudenosaunee understanding of the treaty. He indicated that the treaty was the result of negotiations which began in 1789 and stated his opinion that at that time the Haudenosaunee were interested in maintaining their position of independence from pre- to post-revolutionary America. He testified that the United States' motive in entering into the treaty was to secure peace with the Haudenosaunee because it feared that they might join forces with the Indians against whom it was warring in Ohio, Indiana and Michigan. Had the Haudenosaunee joined the war, the war zone would have increased to include the heart of New York and Pennsylvania. Mr. Venables concluded that because the Haudenosaunee believed the treaty to have allowed

them to remain a separate political entity, they would have understood it to have prevented the United States from taxing them in any manner. A report submitted to the trial court by Mr. Venables further concludes that the treaty implicitly accepted the right of the Haudenosaunee to leave their lands to earn a living, as this was their accepted practice before the treaty and that they therefore should not be taxed for doing so.

Appellants also rely on the following provision of the Jay Treaty:

No Duty of Entry shall ever be levied by either Party on Peltries brought by Land, or Inland Navigation into the said Territories respectively, or shall the Indians passing or repassing with their own proper Goods and Effects of whatever nature, pay for the same any Impost or Duty whatever, But Goods in Bales, or other large Packages unusual among Indians shall not be considered as Goods belonging bona fide to Indians.

They argue that this treaty, entered into by the United States and Great Britain in 1794, the same year the Treaty of Canandaigua was signed, sheds light on the nature of the relationship between the United States and the Haudenosaunee at that time. Mr. Venables' report observes that the tariffs and taxes from which this provision of the Jay Treaty exempted the Haudenosaunee were at that time the most important sources of revenue for the United States government. The Lazores argue that this exemption was the functional equivalent of an exemption from the income tax today.

Finally, the Lazores point to the Treaty of Ghent, which the United States and Great Britain entered into in 1815 at the conclusion of the War of 1812. The Ninth Article of the Treaty of Ghent provides that both nations would restore to any Indians with whom each was at war "all the possessions, rights and privileges which they may have enjoyed or been entitled to" before the war. In consequence, both the Jay Treaty and the Treaty of Canandaigua are still observed.

While we are sympathetic to the Lazores' claim that the Treaty of Canandaigua recognized the Haudenosaunee as a separate na-

tion, we are unable to accept it as sufficient to create an exemption from the federal income tax. As we have concluded above, we are constrained from finding an exemption in the absence of some textual support. Nor do we find that the treaty's statement that the United States will not disturb the Haudenosaunee in "the free use and enjoyment" of their lands to be capable of being reasonably construed as supporting an exemption from the income tax. Both the Eighth and Ninth Circuits have rejected claims of exemption based on similar treaty provisions. In *Jourdain v. Commissioner of Internal Revenue*, 617 F.2d 507, 508–09 (8th Cir.), *cert. denied*, 449 U.S. 839, 101 S.Ct. 116, 66 L.Ed.2d 46 (1980), the court rejected the taxpayer's claim that federal taxation of his income violated the prohibition on "molestation from the United States" in the Treaty with the Tribes of Indians of Greenville, 7 Stat. 49 (1795). In *Dillon v. United States*, 792 F.2d 849 (9th Cir.1986), *cert. denied sub nom., Cross v. United States*, 480 U.S. 930, 107 S.Ct. 1565, 94 L.Ed.2d 757 (1987), the taxpayers argued that they were exempt from the income tax by virtue of a treaty provision that exempted the land assigned to them from taxation until the formation of a state constitution and another provision that placed geographic limits on the scope of the Indians' trading activities. *Id.* at 852–53. The court, despite "substantial historical evidence offered by the taxpayers," concluded that neither provision amounted to an exemption. *Id.* at 853. *See also Hoptowit*, 709 F.2d at 566.

The language relied on by the Lazores might be sufficient to support an exemption from a tax on income derived directly from the land. *Hoptowit*, 709 F.2d at 566. In order to hold that the Treaty of Canandaigua exempted the Haudenosaunee from the federal income tax, however, we would need to find language capable of being construed more broadly. We cannot find any such language.

## V.

■ The Lazores further contend that they are exempt from taxation under the provisions of Article I, § 2, cl. 3, of the United States Constitution, and § 2 of the Fourteenth Amendment to the Constitution. Article I provides that seats in the House of Representatives and direct federal taxes are to be apportioned among the states according to population. Excluded from the population of a state for these purposes are "Indians not taxed." Section 2 of the Fourteenth Amendment revised this formula to eliminate the slave fraction that had previously existed, but again excluded "Indians not taxed." The Lazores argue that these clauses are manifestations of the Framers' understanding that a certain subclass of Indians was not part of the polity of the United States and therefore could not be taxed. They contend that they fall within this category of "Indians not taxed" because they consider themselves to be citizens of the Haudenosaunee Nation, rather than of the United States. Thus, they claim, the income tax cannot constitutionally be applied to them unless they forfeit this status. We are unable to accept this assertion and hold that these constitutional provisions do not exempt the Lazores from federal income tax.

The Lazores contend that the Supreme Court recognized the political category of "Indians not taxed" in the case of *Elk v. Wilkins*, 112 U.S. 94, 5 S.Ct. 41, 28 L.Ed. 643 (1884), in which it noted:

> Under the Constitution of the United States, as originally established, "Indians not taxed" were excluded from the persons according to whose numbers representatives and direct taxes were to be apportioned among the several States.... The Indian tribes ... were ... distinct political communities.... The members of those tribes owed immediate allegiance to their several tribes, and were not part of the people of the United States.

*Id.* at 99, 5 S.Ct. at 44. This argument loses its force when one continues to read *Elk*. The second sentence following the quoted passage, continuing the description of the status of Indians vis-a-vis the United States, notes: "Indians and their property, exempt from taxation by treaty or statute of the United States, could not be taxed by any State. General acts of Congress did not apply to Indians, unless so expressed as to

clearly manifest an intention to include them." *Id.* at 99–100, 5 S.Ct. at 44. The first sentence of this quote restates the familiar rule that an exemption from taxation must derive from a treaty or statute—it does not come into being based on membership in some constitutionally-defined class of "Indians not taxed." The second states the since-discredited rule that general acts do not ap-. ply to Indians in the absence of a clear Congressional intent to the contrary. *See Federal Power Comm'n v. Tuscarora Indian Nation,* 362 U.S. at 116, 80 S.Ct. at 553 (noting that, despite the above-quoted language in *Elk,* "it is now well settled by many decisions of this Court that a general statute in terms applying to all persons includes Indians and their property interests."). Nevertheless, the fact that Congress could make a general act—including, presumably, a tax act—applicable to Indians merely by clearly expressing its intention to do so implicitly means that there was no constitutional barrier to its doing so.

As several courts have noted, the constitutional reference to "Indians not taxed" is merely:

> an apportionment provision designed to establish the method of computing the number of representatives for each State and determine apportionment of direct taxes among the states. The phrase "Indians not taxed," when viewed in context, is clearly descriptive, describing the fact some Indians are not taxed by the State in which they reside and should, therefore, be excluded from enumeration of its population. It does not restrain the Federal Government from taxing Indians.

*Jourdain v. Commissioner of Internal Revenue,* 71 T.C. 980, 988, 1979 WL 3595 (1979), *aff'd.,* 617 F.2d 507, 509 (8th Cir.1980). *See also United States v. Willie,* 941 F.2d 1384, 1400 (10th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1200, 117 L.Ed.2d 440 (1992); *Dillon,* 792 F.2d at 852 n. 1; "Indians Not Taxed"—Interpretation of Constitutional Provision, 57 Interior Dec. 195 (1940). As an authoritative treatise on Indian law has not-

ed: "[j]urisdiction to tax Indians must be measured against [applicable] laws and treaties, and the constitutional reference to 'Indians not taxed' is irrelevant to that inquiry except as an oblique reference to the historical point of beginning, when Indians were not subject to any ordinary laws save those of their tribes." Felix S. Cohen, Handbook of Federal Indian Law 389 (1982).

### VI.

■ We must finally consider whether the Tax Court properly upheld the Commissioner's assessment of a penalty for negligence under former I.R.C. § 6653. That statute imposed a penalty based on the amount of any underpayment "due to" a taxpayer's negligence or disregard of the rules.[3] In the case of income tax, "underpayment" was defined as being equivalent to the "deficiency" as that term was defined in I.R.C. § 6211. I.R.C. § 6653(c)(1). For our purposes, § 6211(a) defines "deficiency" as the difference between the amount of the tax actually due and the amount the taxpayer states as the tax due on his return. I.R.C. § 6211(a)(1)(A). Under § 6653(c)(1), however, "the tax shown on a return ... shall be taken into account only if such return was filed on or before the last day prescribed for the filing of such return." I.R.C. § 6653(c)(1) (1986). Thus, for a late return the "underpayment" equals the entire amount of tax due.

The Tax Court concluded that the late filing of a return constituted negligence under § 6653(a) and that the negligence penalty in addition to a lateness penalty could be imposed for a late return. Because the Lazores presented no justification or excuse for their failure to file their return on time, the Tax Court upheld the Commissioner's assessment of additions to tax under § 6653. We believe that the Tax Court's analysis overlooked a crucial step in the application of that section.

Even assuming that late filing, without more, amounts to negligence under

---

**3.** The statute provided: "If any part of any underpayment (as defined in subsection (c)) is due to negligence or disregard of rules or regulations, there shall be added to the tax an amount equal to the sum of—(A) 5 percent of the underpayment." I.R.C. § 6653(a)(1) (1986 version).

§ 6653(a),[4] we do not believe that the penalty is appropriate in this situation. The Lazores believed that they were exempt from the federal income tax. Accordingly, they would have stated on their return that no tax was due even if they had filed on time. The entire amount of the underpayment, then, is "due to" the Lazores' belief that they were exempt from the tax, and none of the underpayment is due to the lateness of their filing.

Furthermore, because we do not share the Commissioner's perception that this is an easy case, we cannot accept the contention that the Lazores were negligent in pressing their claim of exemption from the income tax. The Lazores' assertion of a treaty-based exemption, while ultimately unsuccessful, was made in good faith and was not barred by precedent. Their position has been supported by cogent legal analysis and respected academic opinion. We cannot hold that this was negligence, and therefore we hold that the application of the negligence penalty in this case was improper.

## VII.

For the foregoing reasons, the decision of the Tax Court holding that the Lazores are not exempted from the federal income tax based on the Treaty of Canandaigua will be affirmed, and the Tax Court's decision upholding the application of the penalty for negligence will be reversed.

---

**4.** We note that, although we do not decide the issue, we harbor doubts about this conclusion. The Tax Court based the proposition that lateness equals negligence on the case of *Emmons v. Commissioner*, 92 T.C. 342, 1989 WL 11482 (1989), *aff'd on other grounds*, 898 F.2d 50 (5th Cir.1990), as does the Commissioner. However, that case, as well as the Tax Court's later decision in *Estate of McClanahan v. Commissioner*, 95 T.C. 98, 1990 WL 102397 (1990), involved taxpayers who had established patterns of late-filing over several years. The Lazores' conduct does not rise to this level.