**Andrew L. COOK, individually and doing business as Andy Cook's Truck Stop, and Jeanette Cook, individually and doing business as Andy Cook's Truck Stop, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**No. 93–496 T.**

United States Court of Federal Claims.

Sept. 30, 1994.

Arthur J. Siegel, Albany, NY, for plaintiffs.

Elizabeth K. Wickstrom, U.S. Dept. of Justice, Washington, DC, for defendant.

## OPINION

HODGES, Judge.

Plaintiffs seek a refund for taxes paid to the IRS. This court has jurisdiction pursuant to 28 U.S.C. § 1491(a)(1) (1988). The Government has counterclaimed for taxes allegedly owed by plaintiffs. The principal issue is whether treaties between the Onondaga Nation and the United States exempt Onondaga Indians from paying federal excise taxes on the importation, storage, and sale of diesel fuel.

Both parties have moved for summary judgment on the issue of liability. The facts are not in dispute, and treaty interpretation is a matter of law. We grant defendant's motion for partial summary judgment and deny plaintiffs' motion.

## FACTS

Plaintiffs Andrew and Jeanette Cook are members of the Onondaga Indian Nation, which is part of a confederacy of Indian tribes known as the Haudenosaunee, Iroquois, or Six Nations Confederacy of Indians (Six Nations). The Cooks own and operate Andy Cook's Diesel Truck Stop, a diesel fuel business located along Interstate 81 in Nedrow, New York. The truck stop is within the Onondaga Indian Reservation.

In 1986 and 1987, the Cooks purchased approximately twelve million gallons of diesel fuel from distributors in Canada and sold it to owners and operators of vehicles that consume diesel fuel. The excise taxes were not included in the pump price.

The Cooks did not pay the excise taxes for the sale, storage, and importation of diesel fuel. In 1992, the IRS assessed the following amounts of taxes owed by plaintiffs for their business activities during 1986 and 1987: $1,754,306 for the sale of diesel fuel pursuant to I.R.C. § 4041(a); $7,950 in Leaking Underground Storage Tank (LUST) taxes for the storage of diesel fuel in underground storage tanks pursuant to I.R.C. § 4041(d); and $7,034 in environmental taxes for petroleum products which enter the United States pursuant to I.R.C. § 4611. In addition, IRS demanded $1,344,094.93 interest. Mr. and

Mrs. Cook paid under protest a divisible portion equal to $71.90 and $48.18 of the total excise tax assessment and interest, respectively. At the same time, the Cooks filed a claim for a refund with the IRS, contending that the Fort Stanwix Treaty of 1784, the Fort Harmar Treaty of 1789, and the 1794 Treaty of Canandaigua, between the Onondaga Nation and the United States, exempt them from paying federal excise taxes.

The IRS rejected the refund claim. The Cooks then filed their complaint in this court asking for a refund and a declaratory judgment that they are exempt from federal excise taxes on the importation, storage, and sale of diesel fuel. The Cooks point to three treaty provisions:

1. "[The Six Nations] shall be secured in the peaceful possession of the lands they inhabit" in Article III of the Fort Stanwix Treaty, 7 Stat. 15, 16 (1784).

2. "[The Six Nations] shall be secured in the possession of the lands they inhabit" in Article I of the Treaty of Fort Harmar, 7 Stat. 33 (1789).

3. The United States acknowledge the lands reserved to the Oneida, Onondaga and Cayuga Nations ... to be their property; and the United States will never claim the same, nor disturb them ... in the free use and enjoyment thereof....

Article II of the Canandaigua Treaty, 7 Stat. 44, 45 (1794). The Cooks contend that the excise taxes violate the terms of the treaties by interfering with the free use of their property.

## DISCUSSION

Plaintiffs assert that they are not citizens of the United States and that they are exempt from paying federal excise taxes. Six Nations does have characteristics of an autonomous, independent nation, and many members of the tribes which comprise the Six Nations consider themselves not to be citizens of the United States. *Lazore v. Commissioner of Internal Revenue*, 11 F.3d 1180, 1182 (3d Cir.1993). However, Onondaga Indians are citizens of the United States. *Ex parte Green*, 123 F.2d 862, 864 (2d Cir. 1941), *cert. denied sub nom. Green v. McLar-*

*en*, 316 U.S. 668, 62 S.Ct. 1035, 86 L.Ed. 1744 (1942); *see also Squire v. Capoeman*, 351 U.S. 1, 6, 76 S.Ct. 611, 614–15, 100 L.Ed. 883 (1956) (holding that Indians are United States citizens); *United States v. Neptune*, 337 F.Supp. 1028, 1030 (D.Conn.1972).

"[A] general statute in terms applying to all persons includes Indians and their property interests." *Federal Power Comm'n v. Tuscarora Indian Nation*, 362 U.S. 99, 116, 80 S.Ct. 543, 553, 4 L.Ed.2d 584 (1960). "[G]eneral Acts of Congress apply to Indians as well as to all others in the absence of a clear expression to the contrary ..." *Id.* at 120, 80 S.Ct. at 556. The Supreme Court has yet to hold a federal tax applied to Indians as being unconstitutional. *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. United States*, 845 F.2d 139, 143 (7th Cir. 1988). *See e.g., Lazore*, 11 F.3d at 1187–88; *see also*, Felix S. Cohen, Handbook of Federal Indian Law 389 (1982) ("[T]he constitutional reference to 'Indians not taxed' is irrelevant to that inquiry except as an oblique reference to the historical point of beginning, when Indians were not subject to any ordinary laws save those of their tribes.").

■ The Court stated in *Capoeman* that "Indians are citizens and ... in · ordinary affairs of life, not governed by treaties or remedial legislation, they are subject to the payment of income taxes as are other citizens. ... [T]o be valid, exemptions to tax laws should be clearly expressed." *Capoeman*, 351 U.S. at 6, 76 S.Ct. at 615. "Indians, like all other citizens, are subject to federal income tax unless some provision of a statute or a treaty expressly and specifically confers an exemption." *Critzer v. United States*, 220 Ct.Cl. 43, 48, *cert. denied*, 444 U.S. 920, 100 S.Ct. 239, 62 L.Ed.2d 176 (1979).

Although this general rule refers to exemption from federal income taxes, the rule is also valid for exemption from federal excise taxes. *See Confederated Tribes of Warm Springs Reservation v. Kurtz*, 691 F.2d 878 (9th Cir.1982) (wherein the court applied this principle to determine whether Indian confederation was subject to federal excise tax), *cert. denied sub nom. Confederated Tribes of Warm Springs Reservation v.*

*Egger*, 460 U.S. 1040, 103 S.Ct. 1433, 75 L.Ed.2d 792 (1983); *Lac Courte Oreilles Band*, 845 F.2d at 143 (reasoned in dictum that rationale underlying exemption from income tax for Indians could also apply to exemption from manufacturer's federal excise taxes). The status of being Onondaga Indians does not automatically exempt plaintiffs from their obligation to pay federal taxes.

"Tax exemptions, even those affecting Indians, are not granted by implication. Rather, if Congress intends to exempt certain income, it must do so by a definite expression." *Critzer*, 220 Ct.Cl. at 55 (citing *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 156, 93 S.Ct. 1267, 1274, 36 L.Ed.2d 114 (1973); *Capoeman*, 351 U.S. at 6, 76 S.Ct. at 614–15; *Oklahoma Tax Comm'n v. United States*, 319 U.S. 598, 606–07, 63 S.Ct. 1284, 1287–88, 87 L.Ed. 1612 (1943)).

The excise tax for the sale of diesel fuel is imposed on *any person* who sells to an owner, lessee, or operator of a diesel-powered highway vehicle. I.R.C. § 4041(a)(1)(A). The LUST tax is imposed on any person who is covered by section 4041(a)(1)(A). I.R.C. § 4041(d). As stated above, "any person" includes Onondaga Indians.

Plaintiffs maintain that I.R.C. § 7871 exempts them from paying the sales tax. However, plaintiffs do not qualify for this exemption because 1) they are neither an Indian tribal government nor a subdivision thereof, 2) the sale of fuel by plaintiffs did not involve a State or a political subdivision thereof, and 3) the sale of fuel by plaintiffs did not involve the exercise of "an essential governmental function" as defined in subsection (e). 26 U.S.C. § 7871(a)(2)(A), (b), (d), (e) (1987). The Ninth Circuit court reached the same conclusion in *Warm Springs* when it held that Indians who operated a sawmill on a reservation were not exempt from paying the section 4041(a) fuel tax. *Warm Springs*, 691 F.2d at 880–81; *Lac Courte Oreilles Band*, 845 F.2d at 143–44.

Plaintiffs also assert that *Capoeman* exempts them from the excise taxes. *Capoeman* states that the General Allotment Act of 1887, 24 Stat. 388, 25 U.S.C. § 331 et seq., exempts an Indian's income, derived directly from his or her allotted and restricted land, from income taxation. *Capoeman*, 351 U.S. at 7–8, 76 S.Ct. at 615–16. However, this rule applies only to Indians who hold allotted land under a trust patent and who may not alienate or encumber that land without the consent of the United States. *Id.* at 8–10 n. 15, n. 19, 76 S.Ct. at 616–17 n. 15, n. 19; *United States v. Anderson*, 625 F.2d 910, 914 (9th Cir.1980), *cert. denied*, 450 U.S. 920, 101 S.Ct. 1367, 67 L.Ed.2d 347 (1981). None of the briefs submitted by either side states whether plaintiffs' land is restricted. Plaintiffs have not explained why, after insisting that excise taxes be treated differently from income tax, the rule in *Capoeman* should be applied to excise taxes. Nevertheless, even if the *Capoeman* rule does apply in this case, it would not exempt plaintiffs from the excise taxes. This is because income from operation of a gas station is not considered to be income derived directly from the land. *Saunooke v. United States*, 9 Cl.Ct. 537, 541–44, *aff'd*, 806 F.2d 1053 (Fed.Cir.1986); *see also Critzer*, 220 Ct.Cl. at 51–52 (income from motel, restaurant, and gift shop on possessory holding is taxable); Rev.Rul. 56–342, 1956–2 C.B. 20; *Dillon v. United States*, 792 F.2d 849, 855–56 (9th Cir.1986), *cert. denied sub nom. Cross v. United States*, 480 U.S. 930, 107 S.Ct. 1565, 94 L.Ed.2d 757 (1987).

"[W]hile in general tax exemptions are not to be presumed and the statutes conferring them are to be strictly construed, tax exemptions secured to the Indians by agreement between them and the Government are to be liberally construed." *Landman v. United States*, 71 F.Supp. 640, 109 Ct.Cl. 1, 14–15 (citations omitted), *cert. denied*, 332 U.S. 815, 68 S.Ct. 152, 92 L.Ed. 392 (1947); *Red Lake Band v. United States*, 17 Cl.Ct. 362, 381 (1989). In addition, "[f]ederal agreements with Indians draw their meaning from representations by Government agents to the Indians, as well as from the Indians' own understanding." *United States v. Oneida Nation*, 576 F.2d 870, 217 Ct.Cl. 45, 57–58 (1978). Agreements between the Indians and the United States "are to be read as the Indians understood and would naturally un-

derstand them." *Gila River Pima–Maricopa Indian Community v. United States,* 199 Ct.Cl. 586, 593 (1972) (citing *Peoria Tribe of Indians v. United States,* 390 U.S. 468, 472–73, 88 S.Ct. 1137, 1139–40, 20 L.Ed.2d 39 (1968)).

█ There are limits to liberal construction of Indian treaties, however. "[E]ven though 'legal ambiguities are resolved to the benefit of the Indians,' courts cannot ignore plain language that, viewed in historical context and given a 'fair appraisal,' clearly runs counter to a tribe's later claims." *Oregon Dept. of Fish & Wildlife v. Klamath Indian Tribe,* 473 U.S. 753, 774, 105 S.Ct. 3420, 3432, 87 L.Ed.2d 542 (1985) (citations omitted). Tax exemptions can be granted only if the treaties contain language that can be *reasonably* construed as conferring such exemptions. *Lazore,* 11 F.3d at 1185; *Dillon,* 792 F.2d at 853; *Holt v. Commissioner of Internal Revenue,* 364 F.2d 38, 40 (8th Cir.1966), *cert. denied,* 386 U.S. 931, 87 S.Ct. 952, 17 L.Ed.2d 805 (1967).

We will not follow the more restrictive rule of interpretation employed in *Warm Springs* which demanded a "definite expressed exemption" in a treaty. *See Warm Springs,* 691 F.2d at 882. This is because the court in *Warm Springs* cited the "definitely expressed exemption" requirement from *Mescalero* despite the fact that the Court in *Mescalero* applied the rule to interpret a statute and not a treaty. *Lazore,* 11 F.3d at 1185 n. 2.

Article III of the Fort Stanwix Treaty was analyzed in *Six Nations v. United States,* 173 Ct.Cl. 899, 1965 WL 8406 (1965). After examining historical evidence, the *Six Nations* court concluded that the phrase "they shall be secured in the peaceful possession of the lands they inhabit" means no more than that the United States would not take for itself lands which belong to the Six Nations. *Id.* at 906. The issue in *Six Nations* was very different from the one in this case, but we find that the United States Court of Claims' interpretation applies because the phrase clearly refers to ownership of land. One could argue that excise taxes undermine the condition of being "secured in the peaceful possession"; however, such an interpretation goes beyond the limits of the rules of liberal construction outlined above.

### A. Treaty Language

█ This case hinges on whether the phrase "disturb ... in the free use and enjoyment [of land]" can reasonably be interpreted to mean freedom from federal excise taxes. The Government points to the Third Circuit decision in *Lazore* wherein the court held that the Canandaigua Treaty is not "capable of being reasonably construed as supporting an exemption from the income tax." *See Lazore,* 11 F.3d at 1187.

The treaty provision applies to the use of land. The excise statute in question taxes a particular activity, not the land itself or the plaintiffs' use of the land. Plaintiffs' argument that the fuel tax is a tax on the use of their land fails to note this distinction.

The meaning of "free" is not limited to that of *gratis.* The sales, LUST, and environmental taxes do not preclude plaintiffs from using their land to sell diesel fuel. They are not precluded from engaging in any other activity on their land. Plaintiffs' argument that operating a gas station is the only activity for which their land can be used is not reasonable.

### B. The Treaty as the Onondaga Indians Understood It

To show how the Onondagas who signed the treaties understood them, plaintiffs submitted a study of the history of the treaties between the Six Nations and the United States. William A. Starna, A Report on the 1784 to 1794 Treaty Period and the Six Nations Iroquois (Dec. 8, 1993) (unpublished manuscript). Dr. Starna and plaintiffs assert unequivocally that the Onondagas saw their nation as independent and equal to the United States. To support this claim, they point to the reciprocal language in Articles II and IV of the Treaty of Canandaigua and the fact that the Six Nations agreed in that treaty not to disturb the United States in its free use and enjoyment of its lands. Based on this language, Dr. Starna and plaintiffs contend that the Onondagas expected to be left alone by the United States. They did not expect the United States to assess a tax on them, as the United States did not expect the Ononda-

ga Nation to assess a tax on the United States.

The Government has not provided evidence to the contrary. Instead, it argues that the silence in the treaties as to excise taxes, a type of tax which already existed at the time, indicates that the treaty does not confer an exemption to the Indians. However, silence as to taxation in the treaties creates neither a right to impose taxes nor a prohibition against them. *Warm Springs,* 691 F.2d at 882.

The record suggests that the Onondagas were a defeated nation in 1776; the Indians were pressured to cede vast tracts of territory to the United States. The Onondagas were not on equal ground with the United States, as plaintiffs assert. In fact, the historical lack of Indians' bargaining power vis-a-vis the United States is one of the reasons the Supreme Court has stated that ambiguous treaties are to be interpreted in favor of Indians to compensate for that lack of power.

Given the historical context, the fact that the Indian signees may have understood the treaties to confer them and their descendants exemption from federal taxation is insufficient to overcome the language of a treaty which strongly suggests that the terms do not prohibit federal excise taxes. Viewed in historical context and given a fair appraisal, the plain language cannot reasonably be interpreted as prohibiting federal excise taxes on the sale of diesel fuel by Onondaga Indians on their land. *Accord Klamath Tribe,* 473 U.S. at 774, 105 S.Ct. at 3432.

### C. Judicial Interpretation of Other Indian Treaties

Our standard of reasonableness is in accord with those adopted by other courts. In *Jourdain,* the Eighth Circuit concluded that it is reasonable to interpret a treaty's prohibition of "molestation from the United States" as meaning "interference with the rights of Indians to hunt and otherwise enjoy their land, *not* the 'right' to be free from federal taxation." *Jourdain v. Commissioner of Internal Revenue,* 617 F.2d 507, 509 (8th Cir.) (emphasis added), *cert. denied,* 449 U.S. 839, 101 S.Ct. 116, 66 L.Ed.2d 46 (1980).

In *Dillon,* a treaty provided that "such assigned land ... shall not be aliened or leased for a longer term than two years; shall be exempt from levy, sale or forfeiture ... until a State Constitution, embracing such lands within its boundaries, shall have been formed, and the legislature of the State shall remove the restrictions." *Dillon,* 792 F.2d at 852. The Ninth Circuit in *Dillon* concluded that this restriction on alienation cannot reasonably be construed as conferring a permanent federal income tax exemption for a business operated on treaty land. *Id.* at 854.

The Ninth Circuit has stated that the phrase "for the exclusive use and benefit of said confederated tribes and band of Indians" granted a federal income tax exemption so long as income was derived directly from reserved land. *Hoptowit v. Commissioner of Internal Revenue,* 709 F.2d 564, 566 (9th Cir.1983). The Tax Court concluded that a treaty reserving "the right of taking fish, at all the usual and accustomed grounds and stations," does not establish a tax exemption for income derived from exercising the fishing rights guaranteed by the treaty. *Earl v. Commissioner of Internal Revenue,* 78 T.C. 1014, 1017–18, 1982 WL 11109 (1982).

### CONCLUSION

We hold that the Fort Stanwix Treaty, the Fort Harmar Treaty, and the Treaty of Canandaigua cannot reasonably be construed to provide plaintiffs an exemption from their obligation to pay federal excise taxes on the import, storage, and sale of diesel fuel. Defendant's motion for partial summary judgment is GRANTED and plaintiffs' motion is DENIED.